1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RENO FUENTES RIOS,

11            Plaintiff,                    No. 2:07-cv-0790 WBS KJN P

12        vs.

13   J.E. TILTON, et al.,

14            Defendants.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction

17            Plaintiff proceeds, in forma pauperis and without counsel, in this civil rights

18   action filed pursuant to 42 U.S.C. § 1983.  Plaintiff is a state prisoner serving a life sentence in

19   the custody of the California Department of Corrections and Rehabilitation ("CDCR"), presently

20   incarcerated at California State Prison-Corcoran.  Pending for decision is defendants' second

21   amended motion for summary judgment filed November 19, 2010.[1]  (Dkt. No. 83.)  Plaintiff filed

22   an opposition (Dkt. No. 87); defendants filed a reply (Dkt. No. 92).  For the following reasons,

23   this court recommends that defendants' motion be granted in part and denied in part.

24   ////

25

26        [1]  This matter is before the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), Local
     General Order No. 262, and Local Rule 302(c).

                                        1

II.  Background

      This action proceeds on plaintiff's original complaint filed April 25, 2007 (Dkt. No. 1), against the following five defendants:  J.E. Tilton (former CDCR Secretary);[2] T. Lockwood (Chief, CDCR Regulation and Policy Management Branch, Corrections Standards Authority); Correctional Officers K. Brandon and G. Parker (acting in their capacities as Institutional Gang Investigators); and Correctional Counselor J.E. Mayfield.[3]  Plaintiff alleges that, while he was incarcerated at California State Prison-Sacramento, these defendants relied on false and inadequate information to validate him as a prison gang associate and place him in security housing.  Plaintiff challenges his validation and placement decisions on due process grounds,[4] and further claims that defendants acted in retaliation against plaintiff for exercising his First Amendment rights.[5]

      On March 3, 2009, the district judge adopted the findings and recommendations of the former magistrate judge, and granted defendants' motion to dismiss plaintiff's due process claim against defendant Mayfield, but not plaintiff's retaliation claim against Mayfield.  (Dkt.

---

    [2]  Defendant Tilton was CDCR Secretary from September 13, 2006, to May 16, 2008. (See Tilton's Answer to Plaintiff's Interrogatory No. 1, Dkt. No. 87, Exh. 1 at 50-51 (Pltf. Exh. A-2).)

    [3]  Defendants' titles and positions are presented herein as they appear in the complaint; defendants may no longer hold their respective positions.

    [4]  The court notes that plaintiff's attempt to pursue these challenges in a petition for writ of habeas corpus were rejected for lack of jurisdiction. (See Rios v. California Department of Corrections and Rehabilitation, Case No. 1:08-cv-1048 AWI JLT HC (Dkt. No. 54 at 3-10 (findings and recommendations, filed Feb. 16, 2011)), adopted by order filed April 13, 2011 (Dkt. No. 58).)

    [5]  Among the several documents filed by plaintiff in opposition to defendants' motion for summary judgment is a document entitled in part, "Propose[d] Supplemental Causes of Action" (Dkt. No. 87, Exh. 2 at 98-112 (Pltf. Exh. G) (original brackets omitted).  Therein plaintiff proposes twelve supplemental causes of action based on his original complaint.  However, this action proceeds only on those claims identified in this court's initial screening order, pursuant to 28 U.S.C. § 1915A (see order filed March 6, 2008 (Dkt. No. 8)), as refined by the court's subsequent ruling pursuant to defendants' motion to dismiss (see order filed March 3, 2009 (Dkt. No. 31), and discussion, infra).

1  Nos. 30, 31.)  This action now proceeds on plaintiff's retaliation claims against Mayfield and

2  Parker, and plaintiff's due process claims against all defendants except Mayfield.

3          Plaintiff alleges that CDCR traditionally classified all Hispanic/Mexican inmates

4  as members of one of three "street gangs," based upon the inmate's place of arrest:  "Southern

5   Hispanic" (arrested in Southern California), "Northern Hispanic" (arrested in Northern

6  California), and "Bull Dogs Hispanic" (arrested in Central California).  (Cmplt. at 9-10.)

7  Plaintiff states that he was first classified as a "Northern Hispanic," because he was arrested in

8  Northern California, then reclassified as a "Southern Hispanic," based on his Southern California

9  residence.  (Id. at 10.)  However, plaintiff asserts that he has at all times been a "foreign Mexican

10 national," without any gang affiliations, either in or out of prison.  (Id.)

11          Plaintiff alleges that, in 2004, CDCR improperly reclassified him as a "Border

12 Brother," which plaintiff asserts was a "new label for all the foreign Mexican national inmates,"

13 implemented "in conspiracy to foment most ethnic group gangs against the foreign Mexican

14 national[s] not affiliated to a gang[]."  (Id. at 11.)  Plaintiff was successful in having the "Border

15 Brother" designation dropped, pursuant to an administrative grievance plaintiff filed on

16 September 21, 2004.  (Id. at 11-12.)  That grievance was initially investigated by defendant

17 Parker, who found in pertinent part that plaintiff was not at that time a member or associate of a

18 prison gang.  (Id. at 11.)

19          Plaintiff filed a second administrative grievance on December 12, 2005, in which

20 he sought to advance his work status and reduce his custody status, as recommended to him by

21 the Board of Parole Hearings ("BPH") in 2004, and in anticipation of his 2006 BPH hearing.  (Id.

22 at 12-13.)  Plaintiff asserts that he filed this grievance due to the alleged failure of defendant

23 Mayfield to honor plaintiff's "request to remove any gang label and to provide a reasonable

24 program."  (Id. at 12.)  That grievance, which was ultimately denied, was initially investigated by

25 defendant Mayfield.  (Id. at 13.)  Plaintiff contends that Mayfield thereafter "recommended

26 plaintiff[] for investigation as a prison gang validation in retaliation against plaintiff['s] welfare."

(Id.)

On June 7, 2006, defendant Brandon informed plaintiff that he was being investigated for a gang validation, and plaintiff was placed in security housing pending completion of the investigation.  (Id. at 13-14.)  On June 8, 2006, defendant Parker interviewed plaintiff and submitted a confidential information package to CDCR's Law Enforcement Investigation Unit ("LEIU"), recommending that plaintiff be validated as an associate of the Mexican Mafia ("EME") prison gang.  (Id. at 13.)

On June 18, 2006, plaintiff filed an administrative grievance challenging his validation investigation, alleging that Brandon and Parker used "fraudulently confidential information through the [LEIU] in violation of the California Penal Codes and the California Code of Regulations, Title 15," also referred to as "slanderous false accusation[s]."  (Id. at 15, 16.)  On July 26, 2006, the LEIU validated plaintiff as an associate of the EME prison gang.  (Id.)  On November 1, 2006, Warden Malfi recommended that plaintiff be placed in "the Maximum Security Housing Unit ('SHU') for an indeterminate sentence of six (6) years[6] as [an] active Mexican Mafia 'EME' prison gang associate[]."  (Id. at 17.)  On December 28, 2006, plaintiff's grievance challenging his validation was denied at the Third Level Review.  (Id. at 17.)

Meanwhile, plaintiff's parole hearing scheduled for June 22, 2006, was postponed until January 18, 2007, when parole was denied.  (Id. at 16, 17.)  On February 15, 2007, plaintiff was transferred to the SHU at California State Prison-Corcoran.  (Id. at 17.)

Plaintiff alleges that the five "source items" relied upon to validate his gang association "was gathered by second hand unreliable sources and by staff involved in racketeering activities (RICO) law, with the [CDCR]."  (Id. at 14.)  Plaintiff alleges that the information "did not compl[y] with the standard provisions governed by the [CDCR] gang

---

[6]  While the SHU placement of a prison gang member or associate is technically indeterminate, the prisoner must be free of any gang activity for at least six years before he may be considered for release. Cal. Code Regs. tit. 15, §§ 3341.5(c)(5), 3378(e).

1  management policy and the California Code of Regulations, Title 15, as defined [by] the CDC-

2  115 Disciplinary Rule Violation Report (RVR) of inmate[] misconduct."  (Id. at 15.)

3            Plaintiff seeks a declaratory judgment that his validation and placement are

4  unconstitutional; an order granting his fourteen requests for injunctive relief, which include

5  plaintiff's placement back into the prison general population, expungement of the challenged

6  findings from plaintiff's central file, and the cessation or implementation of several policies and

7  practices within CDCR; the costs of suit and such other relief as the court deems appropriate.

8  (Id. at 19-24.)

9  III.  Legal Standards

10         A.  Legal Standards for Summary Judgment

11  _____Summary judgment is appropriate when it is demonstrated that the standard set

12  forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should be rendered

13  if . . . there is no genuine issue as to any material fact, and . . . the movant is entitled to judgment

14  as a matter of law."  Fed. R. Civ. P. 56(c).

15              Under summary judgment practice, the moving party always bears
                the initial responsibility of informing the district court of the basis
16              for its motion, and identifying those portions of "the pleadings,
                depositions, answers to interrogatories, and admissions on file,
17              together with the affidavits, if any," which it believes demonstrate
                the absence of a genuine issue of material fact.
18

19  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure

20  56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,

21  a summary judgment motion may properly be made in reliance solely on the 'pleadings,

22  depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

23  should be entered, after adequate time for discovery and upon motion, against a party who fails to

24  make a showing sufficient to establish the existence of an element essential to that party's case,

25  and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of

26

1  proof concerning an essential element of the nonmoving party's case necessarily renders all other

2  facts immaterial." Id. at 323.  In such a circumstance, summary judgment should be granted, "so

3  long as whatever is before the district court demonstrates that the standard for entry of summary

4  judgment, as set forth in Rule 56(c), is satisfied." Id.

5            If the moving party meets its initial responsibility, the burden then shifts to the

6  opposing party to establish that a genuine issue as to any material fact actually exists.  See

7  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

8  to establish the existence of such a factual dispute, the opposing party may not rely upon the

9  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

10 form of affidavits, and/or admissible discovery material, in support of its contention that the

11 dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586, n.11.  The opposing party

12 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

13 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

14 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n , 809 F.2d 626, 630 (9th Cir.

15 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

16 return a verdict for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809

17 F.2d at 631.

18           In the endeavor to establish the existence of a factual dispute, the opposing party

19 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

20 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

21 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

22 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

23 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory

24 Committee's note on 1963 amendments).

25           In resolving the summary judgment motion, the court examines the pleadings,

26 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

1  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  <u>Anderson</u>, 477

2  U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court

3  must be drawn in favor of the opposing party.  <u>Matsushita</u>, 475 U.S. at 587.  Nevertheless,

4  inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

5  factual predicate from which the inference may be drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602

6  F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

7  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

8  some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could

9  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

10  trial.'"  <u>Matsushita</u>, 475 U.S. at 586 (citation omitted).

11            On May 15, 2009 (Dkt. No. 16), the court advised plaintiff of the requirements for

12  opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 29.)

13  <u>See</u> <u>Rand v. Rowland</u>, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), <u>cert.</u> <u>denied</u>, 527 U.S. 1035

14  (1999), and <u>Klingele v. Eikenberry</u>, 849 F.2d 409, 411-12 (9th Cir. 1988).

15  IV.  <u>Undisputed Facts</u>

16            The following undisputed facts ("UF") are either undisputed by the parties or,

17  following the court's review of the evidence, have been deemed undisputed.[7]

18

19        [7]  <u>See</u> Dfs. UF (Dkt. No. 83-2 at 1-8); Dfs. Exhibits (Dkt. Nos. 83-3 through 83-23); Pltf.
    UF (Dkt. No. 87-1 at 8-32 (Pltf. Exh. A); Pltf. Decl. (Dkt. No. 87-2 at 73-96) (Pltf. Exh. F); and
20  Pltf. Discovery Exhibits (Dkt. No. 87-1 at 26 through Dkt. No. 87-2 at 72).  Document and page
    references reflect the court's electronic pagination; the parties' internal designations are also
21  provided when appropriate.
            The court notes that both sides have submitted proposed undisputed facts that include
22  unsupported factual assertions and improper legal conclusions.  In addition, plaintiff's
    declaration, rather than setting forth information clearly within plaintiff's knowledge, improperly
23  presents numerous legal arguments interspersed with allegedly (but clearly not) undisputed facts.
    The court further notes that many of defendants' discovery responses perpetuate obfuscation
24  where clarity could have been provided, notwithstanding plaintiff's often compound and
    confusing discovery requests.  Both plaintiff and defendants have proceeded to argue and rebut
25  the merits of this case based in substantial part on allegations unsupported by admissible
    evidence, requiring the court to evaluate each argument and rebuttal in light of what it has
26  gleaned to be the admissible record.

7

1. Plaintiff is a state prisoner in the custody of CDCR, serving a life sentence that commenced in 1989; plaintiff is currently incarcerated in the SHU at California State Prison - Corcoran ("CSP-COR").

2. At all times relevant to this action, plaintiff was incarcerated at California State Prison-Sacramento ("CSP-SAC").

3. At all times relevant to this action, all defendants were employees of CDCR: Tilton was Secretary of CDCR; Lockwood was Chief of the Corrections Standards Authority, Regulation and Policy Management Branch; Brandon was a Lieutenant and Institutional Gang Investigator ("IGI") at CSP-SAC; Parker was an Assistant IGI; and Mayfield was a Correctional Counselor at CSP-SAC.

4. On September 21, 2004, plaintiff filed an administrative grievance (Log No. SAC-C-04-2235), alleging ethnic discrimination, pursuant to which he sought to be classified by prison officials as a "foreigner 'Mexican National,'" rather than a "Border Brother," which plaintiff asserted carried both racist and gang connotations. (Dkt. No. 83-22 (Dfs. Exh. S); Dkt. No. 87-3 at 67 through Dkt. No. 87-4 at 16 (Pltf. Exh. K).)

a. At the Informal Level Review, defendant Parker interviewed plaintiff and reviewed his file; Parker concluded that "there was insufficient information to validate Rios as a member or associate of any prison gang or disruptive group," but cautioned that "Rios' behavior should be closely monitored whenever gang activity or association is present." On December 2, 2004, Parker partially granted plaintiff's grievance, noting that plaintiff's "CDC 812-B will be updated to 'none' by the Institutional Gang Investigator." (Dkt. No. 83-22 at 4; see also Dkt. No. 83-7 at 2-3 (Parker Decl.); Dkt. No. 87-1 at 26-27 ¶ 39 (Pltf. UF).)

b. On February 3, 2005, at the First Level Review, Sergeant Roth denied plaintiff's grievance on the ground that the terms "Mexican National" and "Border Brother" were official and interchangeable designations that were not discriminatory and did not infer

1    association with any gang or disruptive group.  (Dkt. No. 83-22 at 9.)

2    c.    However, on March 7, 2005, at the Second Level Review, the warden partially granted

3          the appeal, explaining (Dkt. No. 87-4 at 4):

4             A review of your Central File reveals you are identified as
              Mexican, birth place unknown, with a current USINS Warrant
5             number.  Your CDC-12, Non Confidential Critical Information
              Sheet, lists no known current gang affiliation.  The C Facility
6             housing board has listed you as Border Brother for housing
              purposes only, not as gang identifier/affiliation.  The 'Border
7             Brother' labels on the picture board are currently under revision,
              with all 'Border Brother' labels being changed to 'Mexican
8             National;' however, the C Facility housing board will list you as a
              Mexican National for housing purposes only.  This doesn't change
9             your housing status.  You will not receive a chrono identifying you
              as a Mexican National, as this information is already contained in
10            your central file.

11   d.    The Third Level Review, issued June 24, 2005, denied plaintiff's grievance.  Again

12         noting an absence of evidence that plaintiff had any gang affiliation, the final decision

13         explained (id. at 5):

14            On May 13, 2005, the institution was contacted at the Director's
              Level Review (DLR) to obtain additional information.
15            Correctional Lieutenant (Lt.) Banks confirmed that the Facility "C"
              picture board has been revised.  Lt. Banks states that the identifier
16            of "Border Brothers" is no longer used on the picture board and
              "Mexican National" is used in its place.  In this case, the institution
17            has taken the appropriate action.  Justification for intervention at
              the DLR has not been established.

18

19            5.  On December 12, 2005, plaintiff filed another administrative grievance (Log

20   No. SAC-C-06-0599), seeking to reduce his custody status, and advance his work status,

21   consistent with the recommendations of the Board of Prison Terms.  (Dkt. No. 83-23 (Dfs. Exh.

22   T); Dkt. No. 87-3 at 51-66 (Pltf. Exh. J).)  Plaintiff challenged the decision made at his most

23   recent annual classification assessment, on December 5, 2005, denying plaintiff's request to

24   modify his "close-B" status.  (Dkt. No. 83-23 at 2.)  Defendant Mayfield participated in that

25   committee decision.  (Id. at 10; see also id. at 13.)  Plaintiff asserted that he was "erroneously

26   placed as A-2B status with close B-custody," and requested that he be reclassified as "A-1-A,"

1    with reduced custody status of "Med-A," "so I could participate into better program assignment

2    for my develop benefits (sic) and to be assigned for special skills not supporting services. . . ."

3    (Id. at 2.)

4    a.    The grievance was partially granted at the Informal Level Review, on January 3, 2006, by

5          correctional counselor Platt, who noted that plaintiff could be reclassified "A-1-A" when

6          his work assignment was changed, but that he needed to serve a full two years in "close-

7          B" custody status.  (Dkt. No. 83-23 at 2.)

8    b.    Defendant Mayfield interviewed plaintiff at the First Level Review, on April 5, 2006, and

9          concluded that plaintiff's classification and custody status were correct; the grievance was

10         denied on April 11, 2006.  (Dkt. No. 83-23 at 3.)

11   c.    On April 16, 2006, plaintiff challenged Mayfield's calculation of the two-year time period

12         relative to his "close-B" status, asserted that his file contained inaccurate information

13         regarding his skill levels, and contended that the "[l]ibrary does have space for a

14         Mexican, half time Northener -- half time Mexican National."  (Id.)  The grievance was

15         denied at the Second Level Review by Warden Malfi on May 16, 2006. (Id. at 3, 21-23.)

16   d.    On September 5, 2006, the Chief of Inmate Appeals, N. Grannis, denied plaintiff's

17         grievance at the Third Level Review, on the ground that the December 5, 2005

18         classification decision was correct, noting that plaintiff could be considered for a custody

19         reduction to "medium A" at his next classification meeting in November 2006.  (Id. at 24-

20         25.)

21                6.    Meanwhile, on June 7, 2006, plaintiff was transferred to the Administrative

22   Segregation Unit ("ASU") at CSP-SAC, pending completion of an investigation into plaintiff's

23   gang affiliations.  Defendant Lt. Brandon provided plaintiff with a copy of his CDC 114-D

24   ("Administrative Segregation Unit Placement Notice"), dated June 7, 2006, and informed

25   plaintiff of the information upon which the ASU placement was made.  (Dkt. No. 83-14 (Dfs.

26   Exh. K); Dkt. No. 83-8 at 2 (Dfs. Exh. E); Dkt. No. 87-1 at 15 ¶¶ 16, 17 (Pltf. UF); Dkt. No. 87-2

1    at 76, 83-4 ¶¶ 7, 20 (Pltf. Decl.) .)

2           7.   On June 8, 2006, defendant Parker interviewed plaintiff and, based on the

3    information collected by Brandon, submitted to the LEIU a CDC-128 General Chrono

4    recommending that plaintiff be validated as an associate of the Mexican Mafia ("EME") prison

5    gang (hereafter "EME").  (Dkt. No. 83-8 at 2 (Dfs. Exh. E).)  The recommendation was based on

6    the following information compiled by Lt. Brandon; each item was reported on a CDC 1030

7    Chrono (Confidential Information Disclosure Form), prepared by Parker, and dated June 7, 2006:

8    a.    A June 1, 2006 confidential memorandum prepared by Parker, noted that plaintiff's name

9          was on a list of active EME associates prepared by another inmate/validated EME

10         associate, intended for receipt by a third inmate/validated EME member.[8]  (Dkt. No. 83-8

11         at 2 (Dfs. Exh. E); Dkt. No. 85-13 (Dfs. Exh. J).)

12   b.    A January 26, 2006 debriefing report prepared by Sergeant Bales, identified plaintiff as a

13         "mesa" member of the EME gang, working under the direction of another inmate/

14         validated EME associate; the term "mesa" refers to an appointed leadership position

15         governed by EME members housed in the SHU.  (Dkt. No. 83-8 at 2 (Dfs. Exh. E); Dkt.

16         No. 85-12 (Dfs. Exh. I).)

17   c.    An October 21, 2005 confidential memorandum prepared by Officer Zamudio, stated that

18         plaintiff ordered an assault to benefit EME, and showed letters he received from another

19         inmate/validated EME member. (Dkt. No. 83-8 at 2 (Dfs. Exh. E); Dkt. No. 85-11 (Dfs.

20         Exh. H).)

21   d.    A February 4, 2004 "confidential CDC 128 B" prepared by Officer Wheeler, stated that

22         plaintiff authored and passed a note to an inmate/validated EME associate, requesting that

23         the inmate assault his own cell mate, another validated EME associate.  (Dkt. No. 83-8 at

24         2 (Dfs. Exh. E); Dkt. No. 85-10 (Dfs. Exh. G).)

25   _____

26         [8] Although unidentified in these findings and recommendations, the cited memoranda
     identify the third party inmates by their full names, nicknames and identification numbers.

e.      A March 25, 2003 debriefing report prepared by Sergeant Bales, stated that plaintiff sold

drugs under the authority of another inmate/validated EME associate.  (Dkt. No. 83-8 at 2

(Dfs. Exh. E); Dkt. No. 85-9 (Dfs. Exh. F).)

8.  Each of the above-noted CDC 1030 Chronos indicated that the information

relied upon was considered reliable because the reporting source incriminated himself in a

criminal activity at the time he provided the information; each chrono further provided that

disclosure of the underlying information would threaten the safety and security of the institution.

(Dkt. Nos. 85-9 through 85-13; see also Dkt. No. 87-2 at 118-19.)

9.  On June 8, 2006, when defendant Parker interviewed plaintiff regarding the

above-noted information, plaintiff reportedly responded, "I disagree with all the documents

submitted.  I am a Mexican National and not a gang member.  I fe[e]l I have been set up."  (Dkt.

No. 83-8 (Dfs. Exh. E).)

10.  Plaintiff was not provided with the confidential documents themselves.

Defendant Parker states that doing so "would create a hazard to the safety and security of the

institution [because] each of these [confidential] documents contains other inmates' names and

CDC numbers . . . ." Dkt. No. 83-7 at 3 (Parker Decl ¶ 8).)

11.  On June 14, 2006, plaintiff appeared for his Initial ASU Review before the

ASU Institutional Classification Committee ("ICC").   The ICC decided to retain plaintiff in the

ASU pending completion of his validation investigation, and referred plaintiff to the

Classification Staff Representative ("CSR") for a 90-day ASU extension.  Plaintiff reportedly

stated, "I am not an associate of the EME."  (Dkt. No. 83-15 (Dfs. Exh. L) (CDC 128-G Chrono,

dated June 14, 2006).)

12.  On July 3, 2006, the CSR extended plaintiff's ASU placement for 90 days

pending completion of plaintiff's validation investigation.  (Dkt. No. 83-16 (Dfs. Exh. M) (CDC

128-G Chrono, dated July 14, 2006).)

13.  On August 16, 2006, plaintiff again appeared before the ASU ICC, which

12

1   referred plaintiff to the CSR for a second 90-day ASU extension pending completion of his

2   validation investigation.  Plaintiff reportedly stated, "I am not a Mexican Mafia associate.  All

3   the information is hearsay."  (Dkt. No. 83-17 (Dfs. Exh. N) (CDC 128-G Chrono, dated August

4   16, 2006).)

5          14.  On September 11, 2006, the CSR extended plaintiff's ASU placement for a

6   third period of 90 days pending completion of plaintiff's validation investigation.  (Dkt. No. 83-

7   18 at 2 (Dfs. Exh. O) (CDC 128-G Chrono, September 11, 2006).)

8          15.  On September 27, 2006, three members of the Office of Correctional Safety

9   found, based upon the information contained in the five documents forwarded by defendant

10  Parker, that plaintiff met the requirements for validation as "an associate of the Mexican Mafia

11  (EME) prison gang," citing California Code of Regulations, title 15, section 3387; see also Cal.

12  Code Regs. tit. 15, § 3378(c)(6)) (decision to be made by Office of Correctional Safety).  (Dkt.

13  No. 83-21 (Dfs. Exh. R) (CDC 128-B-2 chrono, dated September 27, 2006); Dkt. No. 87-1 at 30

14  ¶ 45 (Pltf. UF).)

15         16.  On November 1, 2006, plaintiff again appeared before the ASU ICC, which

16  informed plaintiff that the investigation was complete and plaintiff was now validated as an EME

17  associate.  The ICC referred plaintiff to the CSR for transfer to the SHU at Pelican Bay State

18  Prison or California State Prison-Corcoran.  Plaintiff reportedly stated, "It's all false, I'm not a

19  Mexican Mafia, I'm from Mexico!"  (Dkt. No. 83-19 at 2 (Dfs. Exh. P) (CDC 128-G Chrono,

20  dated November 1, 2006); Dkt. No. 87-1 at 30-31 ¶ 47 (Pltf. UF).)

21         17.  On December 11, 2006, the CSR endorsed plaintiff for transfer to the SHU at

22  California State Prison-Corcoran.  (Dkt. No. 83-20 at 2 (Dfs. Exh. Q) (CDC 128-G Chrono,

23  dated December 11, 2006).)

24         18.  Meanwhile, on June 18, 2006, plaintiff filed a third administrative grievance

25  (Log No. SAC-S-06-1422), challenging his validation as an EME associate.  Plaintiff alleged that

26  the five informational items relied upon were untrue, failed to meet reliability standards, and

1   were "jointly created" by defendants Brandon and Parker, and staff members Bales, Wheeler and

2   Zamudio; plaintiff further alleged that Brandon and Parker acted in retaliation against plaintiff

3   because he filed a civil action.[9]  (Dkt. No. 87-2 at 116.)  (In his deposition, plaintiff clarifies that

4   his instant retaliation claims are made only against Parker and Mayfield.  (Dkt. No. 83-4 at 5.) )

5   Plaintiff asserted that he was not a gang associate and did not pose a threat to the safety and

6   security of the prison.  Plaintiff requested that his validation be cancelled and all reference to it

7   removed from his Central File, and that plaintiff be released back to the general population.

8   (Cmplt. at 15 ¶ 24;  Dkt. No. 87-2 at 113-21 through Dkt. No. 87-3 at 50 (Pltf. Exhs. H, I).)

9   a.      Informal and First Level Reviews were bypassed.  (Dkt. No. 87-2 at 114-15.)

10  b.      Plaintiff's grievance was denied at the Second Level Review, pursuant to defendant

11          Brandon's interview of plaintiff on August 31, 2006, and a finding that each of the five

12          items relied upon to make the validation decision were reliable.  (Dkt. No. 87-3 at 1-5.)

13  c.      The Third Level Decision was rendered on December 28, 2006.  (Dkt. No. 87-2 at 115;

14          Dkt. No. 87-3 at 29-30.)  That decision concluded that the information and procedures

15          relied upon to validate plaintiff were valid and reliable, and that "[t]he appellant has

16          failed to provide any information to support his position that he has been inappropriately

17          validated as an active associate of EME prison gang."  (Dkt. No. 87-3 at 30.)

18  V.  Discussion

19      A.  Due Process Claims

20          Plaintiff challenges his gang validation and security housing placement on due

21  process grounds, against all defendants except Mayfield.  (Dkt. No. 30, 31.)  Against Brandon

22  _____

23      [9]  The referenced prior action appears to be Rios v. CDC Director, Case No. 2:04-2349
    ALA P [previously FCD DAD P], in which plaintiff claimed in part that High Desert State Prison
24  staff, in 1997, conspired to file, and did file, false reports against plaintiff in violation of the
    Racketeer Influenced and Corrupt Organizations ("RICO") Act.  The amended complaint was
25  dismissed with prejudice.  (Id., Dkt. No. 23.)  An earlier action filed by plaintiff, Rios v. Castro,
    Case No. 2:00-0905 WBS GGH P, similarly alleged in part that plaintiff had been denied parole
26  based in part on the submission of false information.  (Id., Dkt. No. 42 at 5.)  (See instant case,
    Dkt. No. 87-2 at 79 ¶ 13 (Pltf. Decl.).)

                                              14

1  and Parker, plaintiff contends that the procedures and evidence supporting his validation were,

2  respectively, inadequate and false.  Against Tilton and Lockwood, plaintiff challenges CDCR's

3  formal policies and procedures generally, and contends that his validation reflects CDCR's

4  "underground" policy of housing together inmates of the same ethnicity, amongst gang members

5  and associates, thereby entrapping the unknowing inmate, as it allegedly snared plaintiff.  For the

6  reasons that follow, the court finds that summary judgment should be granted in defendants'

7  favor on all of plaintiff's due process claims.

8        The state regulations governing prison gang validation and security housing are

9  well established.  A prisoner's gang involvement is considered "information . . . which is or

10  may be critical to the safety of persons inside or outside" of California prisons.  Cal. Code Regs.

11  tit. 15, § 3378(a).  In response to this concern, institutional gang investigators are assigned to

12  each prison to investigate allegations of gang involvement.  Id., § 3378(c).  Allegations that a

13  prisoner is involved in gang activity are to be set forth on a "CDC Form 812-A or B," id., §

14  3378(c)(1), wherein documented gang activity within the past six years is deemed "current

15  activity," id.  An inmate may be validated as a gang member or associate based upon three or

16  more independent sources of information "indicative of" "actual membership" or "association

17  with validated gang members or associates."  Id., §§ 3378(c)(3), (4).  Such information may

18  include, inter alia, statements from other inmates, debriefing reports, written materials and

19  communications, and observation by staff.  Id., § 3378(c)(8).  Statements from informants may

20  be relied upon only if their information is independently corroborated or the informant is

21  otherwise known to be reliable.  Id., §§ 3378(c)(8)(H); 3321(b)(1).

22        Pending completion of an investigation whether an inmate warrants gang

23  validation, the inmate may be placed in administrative segregation.  Id., § 3335 (authorizing

24  "immediate" segregation of an inmate whose "presence in the general inmate population presents

25  an immediate threat to the safety of the inmate or others, endangers institution security or

26  jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal

15

1   activity"). Once the prison determines that an inmate is a member or associate of a prison gang,

2   the inmate is routinely transferred to a SHU. Id., § 3341.5(c)(2)(A) (2) ("a validated prison gang

3   member or associate is deemed to be a severe threat to the safety of others or the security of the

4   institution and will be placed in a SHU for an indeterminate term"). Once an inmate has been

5   validated as a gang member or associate and placed in the SHU, he must be free of any gang

6   activity for at least six years before he may be considered for release. Id., §§ 3341.5(c)(5),

7   3378(e). (Alternatively, an inmate may released from the SHU if he chooses to "debrief," that is,

8   admit his gang affiliation, identify other gang members, and reveal all he knows about gang

9   structure - he will be released from the SHU at the end of the debriefing process. Id., §

10  3378.1(d)). An inmate placed in the SHU receives periodic reviews, at intervals of 180 days.

11  Id., § 3341.5(c)(2)(A).

12          These procedures comport with constitutional requirements. The process

13  constitutionally due an inmate placed in segregated housing depends on whether the placement is

14  disciplinary or administrative. Toussaint v. McCarthy, 801 F.2d 1080, 1099 (9th Cir. 1986). In

15  Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003), the Ninth Circuit determined that

16  California's policy of placing suspected gang members in segregation is an administrative

17  decision, undertaken to preserve order in the prison. When an inmate is placed in segregation for

18  administrative purposes, due process requires only the following procedures:

19              Prison officials must hold an informal nonadversary hearing within
                a reasonable time after the prisoner is segregated. The prison
20              officials must inform the prisoner of the charges against the
                prisoner or their reasons for considering segregation. Prison
21              officials must allow the prisoner to present his views. . . . [D]ue
                process [ ] does not require detailed written notice of charges,
22              representation by counsel or counsel-substitute, an opportunity to
                present witnesses, or a written decision describing the reasons for
23              placing the prisoner in administrative segregation.

24  Toussaint, 801 F.2d at 1100-01 (footnote omitted).

25          Prisoners are entitled to the minimal procedural protections of adequate notice and

26  an opportunity to be heard. Bruce, 351 F.3d at 1287. In addition to these minimal protections,

16

1    there must be "some evidence" supporting the decision to place a prisoner in segregated housing.

2    Id. (citing Superintendent v. Hill, 472 U.S. 445, 454 (1985)).

3            The "some evidence" standard sets a low bar, consistent with the recognition that

4    assignment of inmates within prisons is "essentially a matter of administrative discretion,"

5    subject to "minimal legal limitations." Bruce, 351 F.3d at 1287 (citing Toussaint, 801 F.2d 1080,

6    with respect to the minimal limitations). A single piece of evidence may be sufficient to meet the

7    "some evidence" requirement, if that evidence has "sufficient indicia of reliability." Id., at 1288.

8    In applying this standard the court is not required to "examine the entire record, independently

9    assess witness credibility, or reweigh the evidence; rather, 'the relevant question is whether there

10   is any evidence in the record that could support the conclusion.'" Id. (citing Hill, 472 U.S. at

11   455-56).

12           1.  Defendants Brandon and Parker

13           Plaintiff contends that defendant Brandon denied plaintiff due process "by not

14   properly providing accurate complete copies of any substantial evidence of his accusation."

15   (Cmplt. at 16.)  Plaintiff contends that "[d]efendant G. Parker denied plaintiff's due process

16   rights by not provid[ing] [a] staff assistant," or "accurate and complete adequate copies" of the

17   "five (5) items classified as confidential information to validate[] plaintiff . . . ." (Id. at 14.)

18   Plaintiff also contends that neither defendant Brandon nor Parker gave plaintiff his "24-hour

19   interview." (Dkt. No. 87-1 at 24-25 ¶ 34.)  None of these claims raise material factual disputes

20   requiring resolution by trial.

21           Plaintiff's challenge to the "24-hour interview" appears to be premised on the

22   regulatory requirement that an inmate considered for validation be accorded 24 hours to prepare

23   for an interview in which he may challenge the items offered in support of his recommended

24   validation. See Cal. Code Regs. tit. 15, § 3378(c)(6)(B). Plaintiff directs the court to no

25   evidence that supports his allegation that he was denied this opportunity. Rather, the evidence of

26   record indicates that defendant Brandon properly disclosed to plaintiff the items referenced in the

17

1    proposed validation on June 7, 2006, and that defendant Parker interviewed plaintiff the next day

2    (prior to submitting the validation package to the LEIU), when he told plaintiff that "this was an

3    opportunity to dispute information used in the validation." (Dkt. Nos. 83-8, 83-14.)  This

4    evidence supports a reasonable inference that plaintiff was accorded the requisite "24-hour

5    interview."

6           Similarly, plaintiff does not support his contention that Parker should have

7    provided him a staff assistant.  The regulations require the appointment of a staff assistant to

8    inmates who are unable to understand or participate in a given process.  See e.g. Cal. Code Regs.

9    tit. 15, §§ 3000 ("effective communication"); 3315(d)(2), 3318(b) (serious rule violations);

10   3339(b)(3) (administrative segregation); 3341 (classification hearing on segregation order).

11   Review of the record indicates that at all relevant times defendants assessed plaintiff's need for

12   an assistant, and determined that it was unnecessary.  Pursuant to his June 8, 2006 interview with

13   plaintiff, Parker specifically noted that "[a] review of Rios' Central File revealed his educational

14   level G.P.L. to be 7.7.  Rios did not request staff assistance and stated that he understood the

15   proceedings of the gang review.  Staff assistance was therefore not assigned by the IGI." (Dkt.

16   No. 83-8.)  Additionally, pursuant to plaintiff's June 16, 2006, August 16, 2006, and November

17   1, 2006, ASU ICC meetings, it was expressly determined that a staff assistant was unnecessary

18   because the issues were not complex and plaintiff was not a participant in the Mental Health

19   Services Delivery System ("MHSDS"); nor is there any record that plaintiff requested an

20   assistant.  (Dkt. Nos. 83-15, 83-17, 83-19.)  This evidence supports a reasonable inference that

21   plaintiff was not improperly denied a staff assistant.

22          Plaintiff also challenges the sufficiency and reliability of the evidence supporting

23   his validation and placement.  Plaintiff contends that the information relied upon was false,

24   incomplete, inadequate and unreliable.  Plaintiff initially contends that defendants failed to

25   disclose all of the information they relied on to validate plaintiff.  However, in response to an

26   inquiry by the court, defendants expressly stated that the only information they relied on are the

1    five items described above.  See Order filed March 7, 2011 (Dkt. No. 94) (directing defendants to

2    inform the court whether they intended to rely on any additional information to demonstrate the

3    appropriateness of plaintiff's gang validation); see also Defendants' Response filed March 15,

4    2011 (Dkt. No. 95) (wherein defendants stated that they intended to rely only on the five noted

5    items).

6          Plaintiff further contends that defendants failed to disclose all of the confidential

7    information underlying each of the five items relied on to support his validation.  However,

8    defendants were authorized to withhold information deemed confidential by CDCR.  Each of the

9    five CDC 1030 Chronos states that it is based on confidential information withheld from plaintiff

10   because disclosure would threaten the safety and security of the institution (Dkt. Nos. 85-9

11   through 85-13; see also Dkt. No. 87-2 at 118-19), thereby meeting the requirement for classifying

12   and withholding confidential information, see Cal. Code Regs. tit. 15, § 3321(a) (institution may

13   withhold classified confidential information which, if known to inmate, would endanger the

14   safety of any person or jeopardize the security of the institution).  Each Chrono further provides

15   that the individual who reported the confidential information had incriminated himself in a

16   criminal activity at the time he provided the information, thus satisfying the regulations' criteria

17   for reliability.  Id., § 3321(c)(3) ("[a] confidential source's reliability may be established by

18   [alleging that]. . .[t]he information provided by the confidential source is self-incriminating");[10]

19   see also id., § 3321(b) (classified confidential material must be corroborated or otherwise found

20   reliable).  Plaintiff has failed to raise a material factual dispute relative to defendants'

21   withholding of confidential information.

22

---

23       [10]  Pursuant to Section 3321(c), "[a] confidential source's reliability may be established
     by one or more of the following criteria:  (1) The confidential source has previously provided
24   information which proved to be true; (2) Other confidential source have independently provided
     the same information; (3) The information provided by the confidential source is
25   self-incriminating; (4) Part of the information provided is corroborated through investigation or
     by information provided by non-confidential sources; [or] (5) The confidential source is the
26   victim."  Cal. Code Regs. tit. 15, § 3321(c).

1          Plaintiff further challenges the reliability of his validation information based on

2    the failure of any defendant to previously inform plaintiff of the March 2003 and February 2004

3    source items,[11] before commencing the validation process in June 2006.  Plaintiff directs the

4    court's attention to the December 2, 2004 assessment of defendant Parker, when he partially

5    granted plaintiff's administrative grievance challenging his ethnic classification (Log No. SAC-

6    C-04-2235), that "there was insufficient information to validate Rios as a member or associate of

7    any prison gang or disruptive group."  (Dkt. No. 83-22 at 4.)  Plaintiff contends that, had the

8    2003 and 2004 information actually existed and been perceived as reliable, Parker would not

9    have reached this conclusion in December 2004; moreover, that the information would have been

10   revealed to plaintiff at the time they occurred, for example, pursuant to a CDC 115 (rules

11   violation report).  This reasonable inference is not contradicted by the record.  In response to

12   plaintiff's direct inquiry concerning this apparent inconsistency, Parker responded only that he

13   was "without sufficient information, knowledge, or belief to admit or deny" it.  (Dkt. No. 87-2 at

14   3 (Response No. 2), 28-29 (Response No. 5).)  Brandon responded similarly when asked whether

15   there were contradictions in plaintiff's prison file.  (Dkt. No. 87-1 at 99 (Response No. 15).)

16          It is, however, also reasonable to infer that the 2003 and 2004 validation items

17   were not in plaintiff's file when Parker conducted his 2004 review, or that these items were in

18   plaintiff's file but found to be an insufficient basis for concluding that plaintiff then had a gang

19   affiliation.  The latter is a reasonable inference based on Parker's further cautionary statement in

20   2004 that, while "there was insufficient information to validate Rios as a member or associate of

21   any prison gang or disruptive group . . . Rios' behavior should [nonetheless] be closely monitored

22   whenever gang activity or association is present."  (Dkt. No. 83-22 at 4.)

23

24          [11]  Plaintiff refers to: (1) the March 25, 2003 report by Sergeant Bales that plaintiff sold
     drugs under the authority of another inmate/ validated EME associate (Dkt. No. 83-8 at 2 (Dfs.
     Exh. E); Dkt. No. 85-9 (Dfs. Exh. F)); and (2) the February 4, 2004 report by Officer Wheeler
25   that plaintiff requested in writing that one inmate (a validated EME associate) assault another
     inmate (a validated EME associate) (Dkt. No. 83-8 at 2 (Dfs. Exh. E); Dkt. No. 85-10 (Dfs. Exh.
26   G)).

1          More importantly, *even if* these two challenged items were deemed unreliable, the

2    remaining three items are temporally and substantively sufficient to support plaintiff's validation.

3    See Cal. Code Regs., tit. 15, §§ 3378(c)(3), (4) (an inmate may be validated as a gang member or

4    associate based upon "three (3) independent source items of documentation"); see also Bruce,

5    351 F.3d at 1288 ("any of these three pieces of evidence would have sufficed to support the

6    validation because each has sufficient indicia of reliability") (citing Toussaint, 926 F.2d at 803).

7    Therefore, despite the lack of a clear record on this matter, the court finds that plaintiff has failed

8    to raise a material factual dispute concerning the timing and reliability of the source items

9    supporting his gang validation.

10         These several contentions fail to demonstrate a material dispute in support of

11   plaintiff's due process challenges against defendants Brandon and Parker.  The record supports a

12   finding that plaintiff received at least the minimal procedural protections to which he was

13   entitled, specifically, adequate notice and an opportunity to be heard, Bruce, 351 F.3d at 1287,

14   and that plaintiff's validation was supported by "some evidence" with "sufficient indicia of

15   reliability," id. at 1287-88.  The court further notes that plaintiff's resulting temporary and

16   permanent placements in the SHU conformed both with CDCR's regulations, Cal. Code Regs.

17   tit. 15, §§ 3335, 3341.5, and federal law, Toussaint, 801 F.2d at 1100-01; Bruce, 351 F.3d at

18   1287-88.  Accordingly, the court finds, as a matter of law, that defendants Brandon and Parker

19   did not violate plaintiff's due process rights in the process of securing plaintiff's gang validation.

20         2. Defendants Tilton and Lockwood

21         To state a claim for relief under Section 1983 based on a theory of supervisory

22   liability, plaintiff must allege some facts that would support a claim that supervisory defendants

23   personally participated in the alleged deprivation of constitutional rights; knew of the violations

24   and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the

25   policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the

26   constitutional violation.'"  Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989) (internal citations

                                                    21

1  omitted).

2       Plaintiff's due process claims against Secretary Tilton and Regulations Chief

3  Lockwood are premised on plaintiff's broad contention that CDCR promotes "underground

4  regulations" that entrap inmates of the same ethnic group in alleged gang affiliations.  Plaintiff

5  contends that the policy of CDCR to house together, in the general population, inmates of the

6  same ethnic group and/or from the same "locale of commitment," necessarily results in inmate-

7  to-inmate communications which may appear to be, and are therefore unfairly charged by prison

8  officials as, suspected gang activity, inappropriately justified by CDCR's formal regulations.

9  (See Dkt. No. 87, Exh. F ¶ 25 (Pltf. Decl.).)  Plaintiff directs the court's attention to CDCR

10  regulations that define a "gang associate" as "an inmate/parolee who is involved periodically or

11  regularly with members or associates of a gang," and provide that "[i]nmates may not establish or

12  participate in the establishment or activities of any inmate club, inmate activity group, or any

13  association or organization of inmates within the institution except as specifically approved by

14  the warden or superintendent. . . ." Cal. Code Regs. tit. 15, §§ 3378(c)(4), 3020(a).  Plaintiff

15  contends that these and other regulations and practices "create or foment gang activities rather

16  than preventing or rehabilitating inmates and subjecting inmates to be targeted for validation as a

17  prison gang associate by hearsay unreliable information offered by inmates due to personal

18  dislikes or discrimination. . . ." (Dkt. No. 87, Exh. F ¶ 25 (Pltf. Decl.).)

19       In an effort to obtain changes to these and other challenged regulations, plaintiff

20  filed, on January 14, 2007, a Petition to Promulgate Regulations pertaining to gang management

21  and validation, submitted to defendant Lockwood in his capacity as Chief, Regulation and Policy

22  Management Branch, Corrections Standards Authority.  (See Dkt. No. 87, Exh. 4 (Pltf. Exh. O).)

23  On January 27, 2007, Lockwood sent plaintiff a Notice of Decision, also published in the

24  California Regulatory Notice Register, denying the petition.  (Id.)  Plaintiff's due process claim

25  against Lockwood is premised on the official's failure to make regulatory changes consistent

26  with plaintiff's proposals.

22

1        Plaintiff's claims against defendant Tilton are also tangential to plaintiff's

2   challenged validation and housing placement.  The complaint's only relevant allegations against

3   Tilton are set forth in plaintiff's request for relief, wherein he seeks, in pertinent part, the

4   following injunctive relief that "Defendant Secretary [Tilton] . . . [1] cease the practices of

5   validating the inmates as a prison gang as threat to the safety of the security of the institution and

6   others, merely by using hearsays and perjury testimonies from criminal inmates" (Cmplt. at 19);

7   (2) "cease the scheme of using unreliable, untrue, insufficient information in imposing gang

8   validation and indeterminate (SHU) terms [generated as a result of] . . . classifying all the

9   inmates according to their ethnic group and mixed with gang members, associate/affiliated" (id.

10  at 21); (3) "implement a clear and fair prison gang management policy"[12] (id. at 22); (4) "cease

11  the practice of discriminatory classification and segregation of Hispanic/Mexican prisoners and

12  foreign Mexican National inmates not a gang related or associated" (sic) (id.); and (5) "cease the

13  practice of using any underground regulation which has not been properly promulgated pursuant

14  to the (APA) [Administrative Procedures Act] Government Code section 11342 et seq." (id. at

15  23.)

16        Plaintiff has failed to direct the court to any evidence demonstrating that his

17  validation was based on the "underground regulations" he challenges, or that defendants Tilton

18  or Lockwood implemented or promoted regulations "so deficient" as to intrinsically repudiate

19  constitutional rights and be "the moving force" behind plaintiff's alleged constitutional

20  violations.  Hansen, supra, 885 F.2d at 646.  Plaintiff has also failed to allege that either

21  defendant Tilton or Lockwood had any direct connection to any act resulting in the alleged

---

22         [12] Specifically, plaintiff seeks "a clear and fair prison gang management policy that:  (1)
23  provides inmates adequate notice of what conduct is proscribed and what conduct is permitted;
    (2) defines key terms, i.e. gang activity, threat, inactive and active gang affiliates, associates,
24  involvement in gang activity, association; (3) provides clarity for enforcement and does not reach
    a broad range [of] innocent conduct or provide unbridled discretion to defendants; (4) provide
25  reasonable minimal standards to guide defendants when they [are] judging whether or not any
    inmate is a prison gang affiliate/associate or threat to the safety or the security of the institution
26  and others."  (Cmplt. at 22.)

1   deprivation of plaintiff's due process rights.  Plaintiff's allegations against these supervisory

2   defendants are therefore improperly vague and conclusory.  Ivey v. Board of Regents, 673 F.2d

3   266, 268 (9th Cir. 1982). There can be no liability under Section 1983 unless there is some

4   affirmative link or connection between a defendant's alleged actions and the claimed

5   constitutional deprivation.  Rizzo v. Goode, 423 U.S. 362, 371 (1976); May v. Enomoto, 633

6   F.2d 164, 167 (9th Cir. 1980); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

7           Accordingly, the court finds that plaintiff has failed to demonstrate any material

8   factual dispute whether Tilton or Lockwood violated plaintiff's due process rights.  As a matter

9   of law, summary judgment should be granted in favor of both defendant Tilton and defendant

10  Lockwood.

11          B.  Retaliation

12          Plaintiff contends that his validation and SHU placement were actively sought by

13  defendants Parker and Mayfield, who acted in retaliation against plaintiff for exercising his First

14  Amendment rights.  (Although plaintiff's complaint also appears to allege a retaliation claim

15  against defendant Brandon, plaintiff stated at his deposition that his retaliation claims are made

16  against only defendants Parker and Mayfield.  (Dkt. No. 87-2 at 116; Dkt. No. 83-4 at 5.))  "A

17  prisoner suing prison officials under section 1983 for retaliation must allege that he was

18  retaliated against for exercising his constitutional rights and that the retaliatory action does not

19  advance legitimate penological goals, such as preserving institutional order and discipline."

20  Barnett v. Centoni, 31 F.3d 813, 816 (citing Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir.

21  1985)).

22          "[A] viable claim of First Amendment retaliation entails five basic elements:  (1)

23  An assertion that a state actor took some adverse action against an inmate (2) because of (3) that

24  prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

25  Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

26  Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).  Direct and tangible harm will support a

24

1    First Amendment retaliation claim even without demonstration of chilling effect on the further

2    exercise of a prisoner's First Amendment rights.  Id. at 568, n.11.  "[A] plaintiff who fails to

3    allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a

4    retaliatory adverse action.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), citing Rhodes,

5    408 F.3d at 568 n.11.

6           A plaintiff must plead facts which suggest that retaliation for the exercise of

7    protected conduct was the "substantial" or "motivating" factor behind the defendant's conduct.

8    Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).  Mere conclusions of

9    hypothetical retaliation will not suffice; rather, a prisoner must "allege specific facts showing

10   retaliation because of the exercise of the prisoner's constitutional rights."  Frazier v. Dubois, 922

11   F.2d 560, 562 n.1 (10th Cir. 1990).  Retaliatory motive may be shown by the timing of the

12   allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence.

13   Bruce v. Ylst, supra, 351 F.3d at 1288-89 (retaliatory validation as a gang member for filing

14   grievances); Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) .

15          Once such a prima facie showing of retaliation is made, the burden shifts to the

16   defendant prison officials to show, by a preponderance of the evidence, that the alleged

17   retaliatory action was conduct narrowly tailored to serve a legitimate penological purpose.

18   Schroeder v. McDonald, 55 F.3d 454, 461-62 (9th Cir. 1995).  However, "prison officials may

19   not defeat a retaliation claim on summary judgment simply by articulating a general justification

20   for a neutral process, when there is a genuine issue of material fact as to whether the action was

21   taken in retaliation for the exercise of a constitutional right."  Bruce, 351 F.3d at 1289 (citations

22   omitted).

23          1.  Retaliation Claim Against Parker

24          Plaintiff contends that defendant Parker participated in plaintiff's gang validation

25   in retaliation for plaintiff filing civil actions and complaints against other correctional staff.  At

26   his deposition, plaintiff explained that this retaliation claim was based on Parker's alleged failure

1    "to correct the labels to make sure that I was not affiliated with any gang member."  (Dkt. No.

2    83-4 at 6.)  Plaintiff alleges that Parker's alleged retaliation is demonstrated by the fact that, after

3    plaintiff filed a civil rights complaint on November 1, 2004 (Dkt. No. 83-2 at 116), Parker, on

4    December 2, 2004, "partially granted" plaintiff's administrative grievance filed September 21,

5    2004 (Log. No. SAC-C-04-2235), but "then at the end denied it" (Dkt. No. 83-4 at 6-7).

6            The record lacks evidentiary support for the claim that Parker's response to

7    plaintiff's administrative grievance was an "adverse action."  Parker has filed a declaration in

8    which he states that, after he partially granted plaintiff's grievance at the informal level (finding,

9    in pertinent part, that there was insufficient information to validate plaintiff), he did not further

10   participate in the grievance.  (Dkt. No. 83-7 at 2 (Parker Decl.).)  This statement is supported by

11   review of the grievance through its exhaustion.  The official responses to this grievance

12   following the response of Parker (Roth at the First Level Review on February 3, 2005, Warden

13   Kernan at the Second Level Review on March 7, 2005, and the Inmate Appeals Branch Chief, N.

14   Grannis, at the Third Level Review on June 24, 2005) (Dkt. No. 83-22, Dkt. No. 87-3 at 67

15   through Dkt. No. 87-4 at 16)), support Parker's sworn statement that he "had no involvement in

16   appeal SAC-C-04-02235 after responding to it at the informal level."  (Id.)  Parker further

17   declares that he "had no communication with Sergeant Roth, or any other correctional staff

18   member regarding appeal SAC-C-04-02235 after [Parker] responded to this grievance at the

19   informal level."  (Dkt. No. 83-7 at 2-3.)  Plaintiff has presented no evidence to rebut Parker's

20   supported statements.  Moreover, although the subject grievance was ultimately denied, plaintiff

21   obtained the relief he sought, i.e., elimination of the "Border Brother" classification, replaced by

22   reference to "Mexican National."

23           The record also lacks evidentiary support for plaintiff's further claim that Parker's

24   direct participation in plaintiff's validation was motivated by retaliation.  Plaintiff fails to allege

25   any facts in support of his allegation that Parker had a motive to retaliate against plaintiff, or

26   participated in plaintiff's gang validation because of plaintiff's protected conduct.

26

1                    2.  Retaliation Claim Against Mayfield

2              Plaintiff contends that defendant Mayfield, plaintiff's female correctional

3    counselor, referred plaintiff for gang validation in retaliation for plaintiff filing an administrative

4    grievance (Log No. SAC-C-06-0599) that challenged Mayfield's decisions.  Plaintiff testified at

5    his deposition that he filed the administrative grievance, challenging two classification decisions

6    in which Mayfield participated, in order "to lower my classification custodian number so that I

7    could be able to participate in programs and to work." (Dkt. No. 83-4 at 8).  Plaintiff testified that

8    Mayfield "failed in not removing the false gang member activity that's in my file . . . . [S]he

9    could have and she had the right to remove all that and correct it."  (Id. at 4.)  Plaintiff stated that

10   he believed Mayfield thereafter acted in retaliation "due to the 602."  (Id. at 5.)

11             Although no evidence of record appears to directly support plaintiff's contention,

12   the timing of the relevant matters supports a reasonable inference that Mayfield may have

13   referred plaintiff for the gang validation investigation, and may have done so in retaliation for

14   plaintiff's filing and continued pursuit of the subject administrative grievance:  the challenged

15   classification decision was made on December 6, 2005; plaintiff filed his grievance on December

16   12, 2005; defendant Mayfield interviewed plaintiff regarding the grievance on April 5, 2006;

17   plaintiff directly challenged Mayfield's interview findings on April 16, 2006; and, on June 7,

18   2008, plaintiff was informed of his gang validation investigation.

19             Significantly, defendant Mayfield has not filed a declaration in this action, and

20   therefore has not rebutted these reasonable inferences.  Thus, the court finds that plaintiff has

21   demonstrated the existence of material factual disputes concerning Mayfield's role in plaintiff's

22   gang validation investigation and, assuming some role, Mayfield's motivation.

23             The additional elements for stating a retaliation claim have been sufficiently

24   ////

25   ////

26   ////

27

alleged.  Plaintiff's alleged injuries as a result of his gang validation[13] satisfy the requirement of a "direct and tangible harm" resulting from an alleged adverse action.  <u>Brodheim</u>, 584 F.3d at 1269; <u>Rhodes</u>, 408 F.3d at 568 n.11.  Moreover, the finding that plaintiff's validation was consistent with due process requirements does not resolve plaintiff's retaliation claim.  "[I]f, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish [plaintiff] because he filed grievances, they cannot assert that [plaintiff's] validation served a valid penological purpose, even though he may have arguably ended up where he belonged."  <u>Bruce</u>, <u>supra</u>, 351 F.3d at 1289, citing <u>Rizzo</u>, <u>supra</u>, 778 F.2d at 532.

Therefore, the court finds that plaintiff has alleged against defendant Mayfield a viable claim of First Amendment retaliation, for which he has demonstrated the existence of material factual disputes requiring resolution by trial.

VI.  <u>Conclusion</u>

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.  Defendants' motion for summary judgment (Dkt. No. 83) be granted in part and denied in part; and

2.  This action should proceed only on plaintiff's retaliation claim against defendant Mayfield; summary judgment should be granted for all other defendants on all remaining claims.

These findings and recommendations are submitted to the United States District

---

[13]  Plaintiff testified at his deposition that he was injured as follows by defendants' alleged retaliatory conduct (Dkt. No. 83-4 at 8):

> That I cannot participate in program -- in programs by the board of appeal -- by the parole board.  And damages of not being able to be with my family.  And regular visits with my family.  And also damages for the possibility of me leaving the prison.  And also the possibility of paroling.  Because the parole board sees the gang affiliation as a threat to the community.  And the gang affiliation was considered in the -- in the parole hearing, and they just gave me ten years for that.

1    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

2    after being served with these findings and recommendations, any party may file written

3    objections with the court and serve a copy on all parties.  Such a document should be captioned

4    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

5    objections shall be filed and served within 14 days after service of the objections.  The parties are

6    advised that failure to file objections within the specified time may waive the right to appeal the

7    District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8    DATED:  August 22, 2011

9

10                                            _____
                                             KENDALL J. NEWMAN

11                                           UNITED STATES MAGISTRATE JUDGE

12   rios0790.msj

13

14

15

16

17

18

19

20

21

22

23

24

25

26