IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RENO FUENTES RIOS,

      Plaintiff,               No. 2:07-cv-0790 WBS KJN P

     vs.

J.E. TILTON, et al.,

      Defendants.         FINDINGS AND RECOMMENDATIONS

_____/

I.  Introduction

        Plaintiff is a state prisoner, who proceeds in forma pauperis and with appointed counsel, in this civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff is serving a life sentence with the possibility of parole.  Pending for decision is defendants' motion for summary judgment, filed on January 3, 2013.[1]  (ECF No. 134.)  Plaintiff filed an opposition (ECF No. 137); defendants filed a reply (ECF No. 139).  For the reasons that follow, this court recommends that defendants' motion be granted in part and denied in part.

////

////

_____

[1]  This matter is before the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), Local General Order No. 262, and Local Rule 302(c).

1

II.  Background

          This action proceeds on plaintiff's original complaint, filed on April 25, 2007

(ECF No. 1), against the following five defendants:  J.E. Tilton (former CDCR Secretary); T.

Lockwood (Chief, CDCR Regulation and Policy Management Branch Standards); Correctional

Officers K. Brandon and G. Parker (in their capacities as Institutional Gang Investigators); and

Correctional Counselor J.E. Mayfield.[2]  Plaintiff alleges that, while he was incarcerated at

California State Prison-Sacramento (CSP-SAC), these defendants relied on unreliable

information to validate plaintiff as an associate of the Mexican Mafia (EME) prison gang, and

transfer him to the Security Housing Unit (SHU) at California State Prison-Corcoran (CSP-

COR), where plaintiff remains today.  Plaintiff challenges his validation and placement decisions

on due process grounds, against all defendants except Mayfield,[3] and on claims of retaliation

against defendants Mayfield and Parker.

          The pending motion is the second motion for summary judgment in this case.

Pursuant to the first motion for summary judgment, this court, on October 19, 2011, entered

judgment for all defendants except defendant Mayfield, against whom plaintiff's retaliation claim

was permitted to proceed.  (See ECF Nos. 96, 100.)  Plaintiff appealed the court's order, which

was dismissed for lack of jurisdiction on April 3, 2012.  (See ECF Nos. 109-11, 115, 118.)  On

June 7, 2012, this court appointed counsel for plaintiff.  (ECF Nos. 121, 124.)  The case was then

scheduled for trial.  (ECF No. 130.)  However, following the July 6, 2012 decision of the Ninth

Circuit Court of Appeals, in Woods v. Carey, 684 F.3d 934 (9th Cir. 2012),[2] this court accorded

---

     [2]  Defendants' titles and positions are presented as they appear in the complaint.

     [3]  On March 3, 2009, the district judge adopted the findings and recommendations of the former magistrate judge, and granted defendants' motion to dismiss plaintiff's due process claim against defendant Mayfield, but not plaintiff's retaliation claim against Mayfield.  (ECF Nos. 30, 31.)

     [2]  The Ninth Circuit made it clear in Woods that all prisoners proceeding pro se must be provided contemporaneous notice of the requirements for opposing a motion for summary judgment, as set forth in Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998) (en banc), and Klingele

1   plaintiff the opportunity to re-open the prior motion for summary judgment, and to present any

2   evidence that was not previously presented in opposition to the motion.  (ECF No. 131.)

3   Plaintiff, through counsel, chose to re-open the prior motion for summary judgment.  (ECF No.

4   132.)  The court thereafter vacated, in part, its prior findings and recommendations and order,

5   leaving intact plaintiff's retaliation claim against defendant Mayfield.  (ECF No. 133.)

6   Defendants thereafter filed a new motion for summary judgment (ECF No. 134), which is now

7   before the court.

8   III.  Legal Standards for Summary Judgment

9          Summary judgment is appropriate when it is demonstrated that the standard set

10   forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

11   the movant shows that there is no genuine dispute as to any material fact and the movant is

12   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

17   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

18   56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

19   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

20   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

21   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

22   Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

23   burden of production may rely on a showing that a party who does have the trial burden cannot

25   v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).  Woods v. Carey, 684 F.3d at 941.  In this
    case, plaintiff did not receive contemporaneous notice with defendants' prior motion for
26   summary judgment.

1  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

2  should be entered, after adequate time for discovery and upon motion, against a party who fails to

3  make a showing sufficient to establish the existence of an element essential to that party's case,

4  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

5  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

6  necessarily renders all other facts immaterial."  Id. at 323.

7        Consequently, if the moving party meets its initial responsibility, the burden then

8  shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

9  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

10  to establish the existence of such a factual dispute, the opposing party may not rely upon the

11  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

12  form of affidavits, and/or admissible discovery material in support of its contention that such a

13  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

14  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

15  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

16  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

17  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

18  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

19  1436 (9th Cir. 1987).

20        In the endeavor to establish the existence of a factual dispute, the opposing party

21  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

22  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

23  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

24  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

25  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

26  committee's note on 1963 amendments).

1    In resolving a summary judgment motion, the court examines the pleadings,

2    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

4    477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

5    court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

6    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

7    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

8    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

9    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

10   show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

11   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

12   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

13   IV.  Undisputed Facts

14   The following facts are undisputed by the parties or, following the court's review

15   of the record, have been deemed undisputed for purposes of the pending motion.

16   1.  At all times relevant to this action, plaintiff Reno Fuentes Rios was a state

17   prisoner in the custody of CDCR, at CSP-SAC.  Plaintiff is currently incarcerated in the SHU at

18   CSP-COR.  Plaintiff was born in Mexico and lived in Southern California.

19   2.  At all times relevant to this action, defendant Tilton was employed as the

20   Secretary of CDCR; defendant Lockwood was CDCR's Chief of Regulations and Policy

21   Management Branch Standards; defendant Brandon was the CSP-SAC Institutional Gang

22   Investigator (IGI); and defendant Parker was an assistant IGI at CSP-SAC.

23   3.  On September 21, 2004, plaintiff filed an administrative grievance (Log No.

24   SAC-C-04-2235), alleging discrimination, and seeking reclassification as a "Mexican National,"

25   rather than a "Border Brother," which plaintiff asserted was a racist term that inaccurately

26   implied gang affiliation.  (See ECF No. 134-4 (Dfts. Exh. E15).)

5

1      a.  On December 2, 2004, pursuant to the Informal Level Review of

2  plaintiff's grievance, defendant G. Parker, in his capacity as "Security and Investigations Officer,

3  Investigative Services Unit," interviewed plaintiff and reviewed his file.  Parker concluded that

4  "there was insufficient information to validate Rios as a member or associate of any prison gang

5  or disruptive group," but cautioned in writing that "Rios' behavior should be closely monitored

6  whenever gang activity or association is present."  Parker partially granted plaintiff's grievance,

7  noting that plaintiff's "CDC 812-B ['Notice of Critical Information - Disruptive Group

8  Identification'] will be updated to 'none' by the Institutional Gang Investigator."

9      b.  On February 3, 2005, at the First Level Review, Correctional Sergeant

10  D. Roth denied plaintiff's grievance on the ground that the terms, "Mexican National," and

11  "Border Brother," were official and interchangeable designations that were not discriminatory

12  and did not imply association with any gang or disruptive group.

13      c.  On March 7, 2005, at the Second Level Review, CSP-SAC Warden S.

14  Kernan partially granted plaintiff's grievance, explaining (ECF No. 87-4 at 4):

15      A review of your Central File reveals you are identified as
        Mexican, birth place unknown, with a current USINS Warrant
16      number.  Your CDC-12, Non Confidential Critical Information
        Sheet, lists no known current gang affiliation.  The C Facility
17      housing board has listed you as Border Brother for housing
        purposes only, not as gang identifier/affiliation.  The 'Border
18      Brother' labels on the picture board are currently under revision,
        with all 'Border Brother' labels being changed to 'Mexican
19      National;' however, the C Facility housing board will list you as a
        Mexican National for housing purposes only.  This doesn't change
20      your housing status.  You will not receive a chrono identifying you
        as a Mexican National, as this information is already contained in
21      your central file.

22      d.  The Third (Director's) Level Review, issued June 24, 2005, denied

23  plaintiff's grievance.  Again noting the absence of evidence that plaintiff had any gang affiliation

24  ("[y]our CDC-812 . . . lists no known affiliation"), the final decision explained that the term,

25  "Border Brother," had been replaced with "Mexican National" (id. at 5):

26  ////

On May 13, 2005, the institution was contacted at the Director's Level Review (DLR) to obtain additional information. Correctional Lieutenant (Lt.) Banks confirmed that the Facility "C" picture board has been revised. Lt. Banks states that the identifier of "Border Brothers" is no longer used on the picture board and "Mexican National" is used in its place. In this case, the institution has taken the appropriate action. Justification for intervention at the DLR has not been established.

4.  On December 12, 2005, plaintiff filed another administrative grievance (Log No. SAC-C-06-0599), seeking to reduce his custody status, and advance his work status, consistent with the recommendations of the Board of Prison Terms to advance his parole.  (ECF No. 83-23 (Dfts. Exh. T); ECF No. 87-3 at 51-66 (Pltf. Exh. J).)  Plaintiff challenged the decision made at his most recent annual classification assessment, on December 5, 2005, which denied plaintiff's request to modify his "close-B" status.  (Dkt. No. 83-23 at 2.)  Defendant Mayfield, plaintiff's correctional counselor, participated in that committee decision.  (Id. at 10; see also id. at 13.)  Pursuant to that grievance, plaintiff asserted that he was "erroneously placed as A-2B status with close B-custody," and requested that he be reclassified as "A-1-A," with reduced custody status of "Med-A," "so I could participate into better program assignment for my develop benefits (sic) and to be assigned for special skills not supporting services. . . ."  (Id. at 2.)

a.  The grievance was partially granted at the Informal Level Review, on January 3, 2006, by correctional counselor Platt, who noted that plaintiff could be reclassified "A-1-A," when his work assignment was changed, but that he needed to serve a full two years in "close-B" custody status.  (Dkt. No. 83-23 at 2.)

b.  Defendant Mayfield interviewed plaintiff at the First Level Review, on April 5, 2006, and concluded that plaintiff's classification and custody status were correct; the grievance was denied on April 11, 2006.  (Dkt. No. 83-23 at 3.)

c.  On April 16, 2006, plaintiff challenged Mayfield's calculation of the two-year time period relative to his "close-B" status, asserted that his file contained inaccurate information regarding his skill levels, and contended that the "[l]ibrary does have space for a

7

Mexican, half time Northener -- half time Mexican National." (Id.)  The grievance was denied at

the Second Level Review by CSP-SAC Warden A. Malfi on May 16, 2006.  (Id. at 3, 21-23.)

d. On September 5, 2006, the Chief of Inmate Appeals, N. Grannis,

denied plaintiff's grievance at the Third Level Review, on the ground that the December 5, 2005

classification decision was correct, noting that plaintiff could be considered for a custody

reduction to "medium A," at his next classification meeting in November 2006.  (Id. at 24-25.)

5. Meanwhile, on June 7, 2006, defendant Parker authored the first of five Form

CDC 1030 chronos ("Confidential Information Disclosure Forms") relied upon to validate

plaintiff as a gang associate.  Parker's CDC 1030 chrono summarized a June 1, 2006 a

confidential memorandum prepared by Parker which "identified [plaintiff's] name on a list of

active EME associates functioning under the gangs policies, procedures, and guidelines to benefit

the gang.  The list was authored by inmate Martinez, Ray [CDCR #] aka 'Cisco' from

MaraSalvatrucha, a validated EME associate and the intended recipient was inmate Padilla,

Jacques [CDCR #] aka 'Jacko' from Azuza, a validated EME member housed at [CSP-COR]."

(CDC 1030 Chrono, dated June 7, 2006 (Dfts. Exh. E6).)

6. Also, on June 7, 2006, defendant Parker prepared and signed four additional

CDC 1030 chronos, each chrono reflecting an independent "source item" that allegedly supports

plaintiff's status as an EME associate.  All five CDC 1030 chronos denote that the underlying

confidential "source item" was "reliable" because "[t]his source incriminated himself/herself in a

criminal activity at the time of providing the information," and "[d]isclosure of this information

would threaten the safety and security of the institution."  (CDC 1030 chronos, dated June 7,

2006 (Dfts. Exh. E2-E4).)  These four additional CDC 1030 chronos provide in pertinent part:

a. CDC 1030 chrono, documenting a March 25, 2003 debriefing report,

authored by Sergeant J. Bales, which recounts the debriefing of an unidentified inmate who

stated that plaintiff was "selling drugs under the authority of Inmate Vivar, Felipe [CDCR #], aka

'Chispas,' a validated EME associate."  (CDC 1030 chrono, dated June 7, 2006 (Dfts. Exh. E2).)

b.  CDC 1030 chrono, documenting a February 4, 2004 confidential memorandum (Form CDC 128-B), authored by Officer S. Wheeler, who stated that he had confiscated a note allegedly authored by plaintiff, that "request[ed] to have validated EME associate inmate Fuentes, Robert [CDCR #] aka 'Rubio' assaulted.  [Plaintiff] passed the note to Fuentes' cell partner inmate Fernandez, Frank [CDCR #] a validated EME associate."  (CDC 1030 chrono, dated June 7, 2006 (Dfts. Exh. E3).)

c.  CDC 1030 chrono, documenting an October 21, 2005 confidential memorandum, authored by Officer C. Zamudio, which stated that "information received by staff . . . identified [plaintiff] ordering an assault to benefit the EME.  Additionally, [plaintiff] was identified showing letters he received from inmate Padua, Arturo [CDCR #] aka 'Chino,' a validated EME member, to inmates in C-Facility at SAC."  (CDC 1030 chrono, dated June 7, 2006 (Dfts. Exh. E4).)

d.  CDC 1030 chrono, documenting a January 26, 2006 debriefing report, authored by Sergeant J. Bales, which "identified [plaintiff] as a mesa member for the EME prison gang . . . . working under the direction of inmate Vivar, Felipe [CDCR #] aka 'Chispas,' a validated EME associate."  (CDC 1030 chrono, dated June 7, 2006 (Dfts. Exh. E5).)

7.  On June 7, 2006, defendant Brandon, the CSP-SAC IGI, informed plaintiff that he was being placed in the Administrative Segregation Unit (ASU), based on information that he was actively involved with the Mexican Mafia (EME) prison gang, and pending approval of the validation package to the Law Enforcement and Investigations Unit (LEIU).  This "Administrative Segregation Unit Placement Notice" (CDC Form 114D) identified three of the pertinent CDC 1030 chronos (Parker's June 1, 2006 confidential memorandum, Zamudio's October 21, 2005 confidential memorandum, and Bales' March 25, 2003 (improperly designated 2005) confidential memorandum).  (Form CDC 114 D, dated June 7, 2006 (Dfts. Exh. E7).)

8.  Also on June 7, 2006, defendant Brandon completed and signed a "Validation Interview Notification and Disclosure Form" (VIND Form).  The form provides in pertinent part

1  that, pursuant to an investigation completed on the same date, plaintiff had been identified as an

2  EME associate.  The form identifies each of the five "source documents" reflected in the CDC

3  1030 chronos noted above.[3]  (Dkt. No. 137-3 at 4 (Pltfs. Exh. B).)  On the line designated for

4  plaintiff's signature, to "acknowledge receipt of all aforementioned source documents and

5  notification of interview," are the letters "RTS" and the dated June 7, 2006, both apparently

6  written by defendant Brandon.  (Id.)

7          9.  On June 8, 2006, defendant Parker, in his capacity as Assistant IGI, with the

8  CSP-SAC Investigative Services Unit (ISU), authored a Form CDC 128-B General Chrono,

9  which summarized each of the chronos noted above, and concluded that there was "sufficient

10  evidence discovered through investigation to identify [plaintiff] as an associate of the EME

11  prison gang."  (CDC 128-B General Chrono, dated June 8, 2006 (Dfts. Exh. E1).)  This chrono

12  recounted in pertinent part (id.):

13              On June 7, 2006, IGI [defendant Lieutenant] K. Brandon disclosed
              all information used in the validation to [plaintiff].  The copies of
14              all non-confidential source documents were issued to [plaintiff]
              and confidential information was disclosed via CDC 1030,
15              Confidential Disclosure Form.  [Plaintiff] was further given notice
              that an interview regarding his validation, as an associate of the
16              EME, would be held not less than 24 hours from the time of this
              notification.
17
              . . .  On June 8, 2006, [defendant] Assistant IGI Officer G. Parker
18              interviewed [plaintiff] in the Administrative Segregation Unit
              (ASU) office.  Officer Parker explained the purpose of the
19              interview to [plaintiff].  Parker informed [plaintiff ] this was an
              opportunity to dispute information used in the validation.
20              [Plaintiff] stated, 'I disagree with all the documents submitted.  I
              am a Mexican National and not a gang member.  I feel (sic) I have
21              been set up.["]  The interview was concluded.

22  ////

23  ////

24  _____

25      [3]  Plaintiff is incorrect that the VIND form excludes reference to the February 4, 2004
    confidential memorandum authored by Officer Wheeler.  (See ECF No. 137 at 13 n.5.)  The
    memorandum is listed on the Notification form under "Communication (Mail/Notes)."  (ECF
26  No. 137-3 at 4.)

1
2
3

> . . . The interview as well as all evidence obtained during this
> investigation will be forward to the LEIU for consideration in
> acceptance of the validation of [plaintiff] as an associate of the
> EME prison gang.

4      10.  On June 18, 2006, plaintiff filed a third administrative grievance (Log No.

5  SAC-S-06-1422), challenging his preliminary validation as an EME associate.  Plaintiff alleged

6  that the five source items relied upon were untrue, failed to meet reliability standards, and were

7  "jointly created" by defendants Brandon and Parker, and staff members Bales, Wheeler and

8  Zamudio.  (ECF No. 87-2 at 116.)  Plaintiff asserted that he was not affiliated with any gang, and

9  did not pose a threat to the safety and security of the prison.  Plaintiff requested that his

10  validation be cancelled and all reference to it removed from his central file, and that plaintiff be

11  released back to the general population.  (Cmplt. at 15 ¶ 24; ECF No. 137-3 at 6-20 (Pltfs. Exh.

12  C).)

13      a.  Informal and First Level Reviews were bypassed.

14      b.  On September 13, 2006, Warden Malfi denied plaintiff's grievance at

15  the Second Level Review, pursuant to defendant Brandon's interview of plaintiff on August 31,

16  2006, and a finding that each of the five source items were reliable.  (ECF No. 137-3 at 7, 9-12.)

17      c.  On December 28, 2006, the Chief of Inmate Appeals, N. Grannis,

18  denied plaintiff's grievance at the Third Level Review, "concur[ring] with the decision reached at

19  the SLR [Second Level Review]," and finding that "[t]he appellant has failed to provide any

20  information to support his position that he has been inappropriately validated as an active

21  associate of EME prison gang."  (ECF No. 137-3 at 20.)

22      11.  On September 27, 2006, three members of the Office of Correctional Safety

23  (OCS) (the unit charged with verifying an inmate's gang identification under 15 Cal. Code Regs.

24  § 3378(c)(6)) found that each of the five documents included in plaintiff's gang validation

25  package (which has been forwarded to the OCS on June 9, 2006) met the validation requirements

26  set forth in 15 Cal. Code Regs. § 3378, and affirmed plaintiff's validation as an EME associate.

1  (Form CDC 128-B-2 Chrono, dated September 27, 2006 (Dfts. Exh. E14).)  A copy of the

2  September 27, 2006 CDC 128-B-2 Chrono, and five supporting CDC 1030 chronos, were placed

3  in plaintiff's central file.

4          12.  On December 11, 2006 (prior to issuance of the Third Level Decision on

5  plaintiff's administrative grievance challenging his preliminary validation (Log No. SAC-S-06-

6  1422)), plaintiff was endorsed for transfer to the SHU at CSP-COR.  (CDC 128-G chrono, dated

7  December 11, 2006 (Dfts. Exh. E13).)

8          13.  Defendant Tilton was Secretary of the CDCR from April 20, 2006, through

9  May 16, 2008.  (Tilton Decl. ¶ 1.)  He is now retired.  (Id. ¶ 2.)

10         14.  Defendant Parker is currently employed by CDCR as a Sergeant with the

11  Office of Correctional Safety.  (Parker Decl. ¶ 3.)

12         15.  Defendant Mayfield is currently employed by CDCR as a Correctional

13  Counselor II Supervisor at CSP-SAC.  (Mayfield Decl. ¶ 1.)

14         16.  Defendant Brandon, previously the CSP-SAC IGI, is now retired from

15  CDCR.  (Cook Decl. ¶ 4.)  Defendant Brandon did not file a declaration in support of defendants'

16  motion for summary judgment.  However, in his December 11, 2009 responses to plaintiff's

17  requests for admissions, defendant Brandon answered in pertinent part:

18             a.  Denied that he was aware of all of the due process procedures under the

19  California Code of Regulations (CCR) and in CDCR's Department Operations Manual (DOM),

20  stating:  "[A]ssuming this request is asking whether during [defendant Brandon's] employment

21  as a Lieutenant [IGI] for the [CDCR], [Brandon] was aware of all due process procedures in title

22  15 of the [CCR], and articles 2, 22, and 23 of the [DOM], [Brandon] answers as follows:  Deny."

23  (Rios Decl. ¶ 21; Exh. F (ECF No. 137-2 at 33.)

24             b.  Denied that the information obtained during a debriefing must meet the

25  reliability standards set forth in the DOM:  "[A]ssuming this request is asking whether[,] under

26  the [CDCR's] policies and procedures regarding gang validation, information received from an

informant during a debrief[,] must meet the reliability standards outline[d] in Chapter 5, Article 22 of the [DOM], [Brandon] answers as follows: Deny." (Rios Decl. ¶ 21; Exh. G (ECF No. 137-2 at 35.)

17. Defendant Lockwood, CDCR's Chief of Regulations and Policy Management Branch Standards, is responsible for supervising any additions, changes or revisions to the policies and procedures of CDCR's Department Operations Manual (DOM), and title 15 of the California Code of Regulations, to make sure they meet CDCR standards. (Lockwood Decl. ¶ 2.) While Lockwood has no direct involvement in the gang validation of specific inmates, including plaintiff, he is the contact person for inquiries regarding proposed changes to the policies and procedures that support the gang validation process. (Id. ¶¶ 2-4.)

a. On January 14, 2007, plaintiff submitted to defendant Lockwood a "Petition to Promulgate Regulations" (Rios Decl. ¶ 20), recommending formal changes to what plaintiff characterized as an "underground" gang validation process (id.; see also Exh. E (ECF No. 137-3 at 30). The petition, not included in the present record, was characterized by Lockwood as an assertion that plaintiff's validation as an EME associate was "the result of staff conspirators developing false documentation," consistent with "an underground regulation," which allegedly demonstrated that "the regulations that pertain to the classification and documentation process for identifying and validating inmates affiliated or associated with a prison gang must be amended." (ECF No. 137-3 at 30.)

b. On January 29, 2007, defendant Lockwood denied plaintiff's petition. (Rios Decl., Exh. E.) Noting that plaintiff's challenges focused on the gang validation provisions of 15 Cal. Code Regs. § 3378(c), defendant Lockwood found, nevertheless, that the petition was a "protest[] [to] the application of the regulation, not its content or how it was adopted. As such, [plaintiff] is [inappropriately] utilizing the petition process to raise personal grievances with how the regulation is being applied, or to try to challenge the merits of the policy in the regulation, by making generalized criticisms." (Id. at 31.)

V.  Disputed Facts

The parties dispute the following matters.

1.  Plaintiff disputes the alleged reliability of each of the five source items supporting his gang validation.

2.  Plaintiff alleges the following irregularities in the procedures resulting in his gang validation (Rios Decl. ¶¶ 13-7)  :

> i.  Once transferred to the ASU, I was not given 24 hours to prepare for a hearing, as required by California Code of Regulations, Title 15, Section 3378(c)(6)(B) and the Due Process Clause of the Fourteenth Amendment.  In fact, I never had my hearing on June 8, 2006.

> ii.  I was not interviewed by anyone until August 31, 2006, when Defendant Brandon interviewed me at the Second Level Review of a third grievance (one challenging my validation).  I was not given the opportunity to present my side, and at no time did defendants explain to me the evidence they had against me regarding my alleged involvement with the EME.  I was not offered or provided a staff assistant.

> iii.  Moreover, I did not sign (as indicated by the "RTS," meaning "refused to sign") the waiver of my right to question witnesses, nor did I sign the acknowledgment of my failure to request a staff assistant.  My signature is missing because no such interview took place.

> iv.  Moreover, Defendant Parker oddly signed the Validation Interview Notification And Disclosure Form for Defendant Brandon indicating that I attended a June 8 hearing.  See a true and correct copy of the Validation Interview Notification And Disclosure Form, attached hereto as Exhibit B.  (See that Defendant Parker signed for Defendant Brandon on the bottom left-hand side.)

> v.  Defendant Parker's interview report reflects that I denied gang involvement at a June 8 hearing, but I made these statements to Defendant Parker on June 7.

3.  In addition, plaintiff avers that, on June 7, 2006, when defendant Brandon informed plaintiff that he was being investigated for a gang validation, Brandon allegedly told plaintiff, "that I was not allowed to call witnesses at my hearing that would take place the following day, and that I was not allowed to have a staff assistant.  Relatedly, Officer Zamudio

told me that Defendant Brandon was going to 'clean up the yard,' meaning he would move the Mexicans to the SHU." (Rios Decl. ¶ 11.)

        4.  Plaintiff disputes defendant Parker's alleged motivation for recommending plaintiff's gang validation, contending that Parker was motivated by retaliation against plaintiff for filing administrative grievances.

        a.  Plaintiff alleges that defendant Parker made the following statements:

        i.  Plaintiff avers that, in 2004, after Parker concluded that there was insufficient evidence to validate plaintiff as a gang member or associate, Parker nevertheless told plaintiff, pursuant to his review of plaintiff's administrative grievance filed September 21, 2004, "that the prison administration was 'tired of me filing many 602 appeals' and that if I did not stop, he would have no choice but to validate me as a prison gang associate so that he could put me in the SHU." (Rios Decl. ¶ 6.)

        ii.  Plaintiff further avers that, on June 7, 2006, when defendant Parker escorted plaintiff from his cell to the program office, to submit the gang validation package, Parker allegedly told plaintiff, "the administration and warden were 'tired of my 602 complaints.'" (Rios Decl. ¶ 12.)  Plaintiff states that he responded by "deny[ing] any involvement with the EME or any other prison gang, saying, 'I am a Mexican National and not a gang member. I feel I have been set up.'" (Id.)

        b.  Defendant Parker responds, in pertinent part, that, "[i]n recommending Rios's validation as an EME associate, my sole motivation was to ensure institutional safety and security:  validating Rios as an EME associate made the institution safer because it restricted inmate Rios's ability to promote and participate in gang activity. . . . I was not motivated by any inmate grievances he filed against me, nor was I motivated by any of the grievances that I responded to at the informal level (including appeal SAC-C-04-02235).  []  In recommending an inmate for gang validation, I have never been motivated by any grievances filed by the inmate." (Id. ¶¶ 12-4.)

5. The parties dispute defendant Tilton's pertinent responsibilities as former CDCR Secretary.

a. Plaintiff alleges that defendant Tilton, as CDCR Secretary, was directly involved in managing and enforcing CDCR's pertinent gang validation policies and procedures.

b. Defendant Tilton responds that, while he was CDCR Secretary, he "had no involvement in the enactment, modification, or enforcement" of "policies and procedures which govern the process by which inmates are validated as gang members or associates" (Tilton Decl. ¶ 4); and had no direct involvement "in the process by which inmates were validated as gang members or associates," or "the process by which [plaintiff] was validated as an associate of the Mexican Mafia" (id. ¶¶ 5-6).

VI. Discussion

A. Due Process Claims Against Defendants Parker and Brandon

Plaintiff challenges his gang validation and related security placements (ASU and SHU) on due process grounds. For the reasons that follow, this court recommends that defendants' motion for summary judgment on these claims be denied as to defendants Parker and Brandon.

1. Due Process Standards for Gang Validation and Related Security Placement

Under California regulations, the validation of a prisoner as a gang member or associate must be based upon three or more independent "source items of documentation" that are "indicative of" "actual membership" or "association with" validated gang members or associates. 15 Cal. Code Regs. § 3378(c)(3), (4). At least one of the source items must "be a direct link to a current or former validated member or associate of the gang, or to an inmate/parolee or any person who is validated by the department within six (6) months of the established or estimated date of activity identified in the evidence considered." Id., § 3378(c)(4). An inmate who is the subject of a gang validation investigation must be informed of each source item and provided all non-confidential information, not less than 24 hours before the inmate is

provided an interview, and an opportunity to be heard.  Id.,§ 3378(c)(6)(B), (C).  The interview

must be documented and include a record of the inmate's opinion concerning each source item.

Id.,§ 3378(c)(6)(D).  The inmate's mental health status and need for staff assistance must be

evaluated and, if necessary, accommodated prior to the interview.[4]  Id.,§ 3378(c)(6)(F).

However, an inmate's gang validation and related transfer to security placements

will meet federal due process requirements if the inmate is provided only notice of the charges

and evidence against him, an informal hearing with the opportunity to present his views, and

"some evidence" supporting the decision.  "California's policy of assigning suspected gang

affiliates to the Security Housing Unit is not a disciplinary measure, but an administrative

strategy designed to preserve order in the prison and protect the safety of all inmates.  Although

there are some minimal legal limitations, the assignment of inmates within the California prisons

---

[4]  California requires adherence to the following procedures for validating an inmate as a gang associate or member.  "Gang involvement allegations shall be investigated by a gang coordinator/investigator or their designee."  15 Cal. Code Regs. § 3378(c).  "Prior to submission of a validation package to the OCS . . . the subject of the investigation shall be interviewed by the Institution Gang Investigator, or designee, and given an opportunity to be heard in regard to the source items used in the validation or inactive status review."  Id.,§ 3378(c)(6)(A).  "Inmates shall be given written notice at least 24 hours in advance of the interview" and, at the time of notification, "[a]ll source items . . . shall be disclosed to the inmate," who shall be provide with copies of all non-confidential documents."  Id.,§ 3378(c)(6)(B), (C).  "Confidential information . . . shall be disclosed . . . via a CDC Form 1030 []  Confidential Information Disclosure Form."  Id.,§ 3378(c)(6)(C).

"The interview shall be documented and include a record of the inmate's . . . opinion on each of the source items used in the validation.  Staff shall record this information and provide a written record to the inmate . . . within fourteen (14) calendar days and prior to submission of the validation package to OCS."  Id.,§ 3378(c)(6)(D).  "The documented interview shall be submitted with the validation package to the OCS for consideration to approve or reject the validation."  Id.,§ 3378(c)(6)(E).  "The inmate's mental health status and/or need for staff assistance shall be evaluated prior to interview.  Staff assistance shall be assigned per guidelines set forth in section 3318."  Id.,§ 3378(c)(6)(F).

Verification of gang affiliation "shall be validated or rejected by the chief, office of correctional safety (OCS), or a designee."  Id.,§ 3378(c)(6).  "The validation . . . of evidence relied upon shall be documented on a CDC Form 128-B2 [], Gang Validation/Rejection Review, and forwarded to the facility or parole region of origin for placement in the inmate/parolee's central file.  Upon receipt of the CDC Form 128-B2, the Classification and Parole Representative or Parole Administrator I, or their designee, shall clearly note in some permanent manner upon the face of every document whether or not the item met validation requirements."  Id.,§ 3378(c)(6)(G).

1  is essentially a matter of administrative discretion."  Munoz v. Rowland, 104 F.3d 1096, 1098

2  (9th Cir. 1997) (citation omitted); accord, Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003).

3  Therefore:

> [W]hen prison officials initially determine whether a prisoner is to
> be segregated for administrative reasons due process only requires
> the following procedures:  Prison officials must hold an informal
> nonadversary hearing within a reasonable time after the prisoner is
> segregated.  The prison officials must inform the prisoner of the
> charges against the prisoner or their reasons for considering
> segregation.  Prison officials must allow the prisoner to present his
> views.

9  Toussaint v. McCarthy, 801 F.2d 1080, 1100-01 (fn. omitted) (9th Cir. 1986), abrogated in part

10 on other grounds by Sandin v. Conner, 515 U.S. 472 (1995).  Due process "does not require

11 detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity

12 to present witnesses, or a written decision describing the reasons for placing the prisoner in

13 administrative segregation."  Toussaint, 801 F.2d at 1101.

14        2.  The Critical Decisionmakers

15        Evaluation of a prisoner's due process challenge to his gang validation and

16 related housing first requires identification of the "prison official [who] was the critical

17 decisionmaker," and a determination whether the prisoner "had an opportunity to present his

18 views to that official."  See Castro v. Terhune, 712 F.3d 1304, 1308 (9th Cir. 2013); see also

19 Castro v. Terhune, 29 Fed. Appx. 463, 465 (9th Cir. 2002) ("due process . . . require[s] . . . a

20 meaningful opportunity to present his views to the critical decisionmakers"); Castro v. Terhune,

21 237 Fed. Appx. 153, 155 (9th Cir. 2007) (necessity of identifying "actual decisionmaker" as

22 compared to official acting as an "assistant" or "rubber stamp").

23        "Due process requires that a prisoner have 'an opportunity to present his views' to

24 the official 'charged with deciding whether to transfer him to administrative segregation.'"

25 Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990) ("Toussaint IV"), quoting Hewitt v.

26 Helms, 459 U.S. 460, 476 (1983).  "In the case of administrative segregation founded upon

positive gang validation, the official charged with deciding whether to transfer or retain an

inmate in administrative segregation is the IGI.   Thus, prior to validation as a gang member,

[plaintiff is] entitled to an 'informal nonadversary hearing' with an IGI."  Stewart v. Alameida,

418 F. Supp. 2d 1154, 1165  (N.D. Cal. 2006) (citing Toussaint IV, 926 F.2d at 803; and Madrid

v. Gomez, 889 F. Supp. 1146, 1276 (N.D. Cal. 1995) ("[I]t is clear that the critical decisionmaker

in the process is . . . the IGI.")).[5]

The record demonstrates that both defendants Brandon and Parker participated in

the initial decision to validate plaintiff.   Defendant Brandon did not file a declaration in this

action, and the declaration of defendant Parker states only that he "recommended" plaintiff's

validation.  (See Parker Decl. ¶¶ 8, 11-3.)  However, defendant Brandon was the designated CSP-

SAC IGI, with the rank of Lieutenant, while defendant Parker was an Assistant IGI, with the

subordinate rank of Sergeant.  Parker prepared each of the supporting chronos, summarizing the

underlying source items.  The pertinent VIND Form, submitted by plaintiff, bears the signatures

---

[5]  The court in Madrid rejected the notion that formal validation by the Special Services
Unit (SSU) (predecessor to the Law Enforcement Investigation Unit (LEIU)) trumped the
decision-making authority of the IGI:

> Although the SSU agent formally validates the inmate, it is clear that the critical
> "decisionmaker" is the IGI. . . .[T]he SSU plays a technically important but
> substantively nominal role in the process.  Nor are we persuaded that IGIs are
> unaware of the significance of their role.  Given that inmates have an opportunity
> to present their views to the IGI and the ICC, the failure to provide a hearing
> before the SSU officer does not violate due process.

Madrid v. Gomez, 889 F. Supp. at 1276; accord, Stewart v. Alameida, 418 F. Supp. 2d at 1167.
Similarly, in Lira v. Cate (N.D. Cal. Sept. 30, 2009), the court reasoned:

> Although the ICC is the 'designated decision-maker' as to segregation, the actual
> decision to segregate is clearly made by the IGI.  Toussaint v. McCarthy, 926 F.2d
> 800, 803 (9th Cir. 1990) (noting that the "the actual decision to segregate is made
> by the Criminal Activities Coordinator," which is now called the IGI).  Because
> the IGI is the critical decision-maker, an inmate is not entitled to the opportunity
> to present his views to the SSU agent, the agent who formally approves the gang
> validation.  Madrid, 889 F. Supp. at 449; Stewart, 418 F. Supp. 2d at 1167.

Lira v. Cate, supra, Case No. C 00-0905 SI (ECF No. 456 at 37 n.29).

1    of both defendants Brandon and Parker.[4]  (Dkt. No. 137-3 at 4 (Pltfs. Exh. B).)  Defendant

2    Brandon initially signed the form, in the space designated "Date of Disclosure," which is dated

3    June 7, 2006, at 11:15.  (Id.)  The next signature is that of defendant Parker, in the space

4    designated "Date of Interview," which is dated June 8, 2006, at 11:30.  (Id.)

5            For these reasons, the court finds that both defendants Brandon and Parker were

6    the "critical decisionmakers" who made the decision to validate plaintiff, resulting in his transfer

7    to security housing.

8            3.  The Process

9            Plaintiff asserts the following procedural irregularities.  Plaintiff avers that, on

10   June 7, 2006, "[u]pon informing me of the investigation [and transferring plaintiff to the ASU],

11   Defendant Brandon told me that I was not allowed to call witnesses at my hearing that would

12   take place the following day, and that I was not allowed to have a staff assistant."  (Pltf. Decl. ¶

13   11.)  Plaintiff states that he "was not given 24 hours to prepare for a hearing," and "[i]n fact, I

14   never had my hearing on June 8, 2006."  (Id. ¶ 13.)  Plaintiff notes that, on the VIND form, "I did

15   not sign (as indicated by the 'RTS,' meaning 'refused to sign') the waiver of my right to question

16   witnesses, nor did I sign the acknowledgment of my failure to request a staff assistant.  My

17   signature is missing because no such interview took place."[5]  (Id. ¶ 15.)  Plaintiff states that, "I

18   was not given the opportunity to present my side, and at no time did defendants explain to me the

19   evidence they had against me regarding my alleged involvement with the EME.  I was not offered

20   or provided a staff assistant."  (Id. ¶ 16.)  Plaintiff avers that he "was not interviewed by anyone

21

22       [4]   The court is not persuaded that defendant Parker's signature under the typed name of
     defendant Brandon is, in itself, "odd" or otherwise indicative of errant procedures.  (Pltf. Decl. ¶
23   16.)  Moreover, defendants' limited assertions that Brandon conducted the hearing (see Dfts. Sep.
     Stmt. of Undisp. Facts (ECF No. 134-3, ¶¶ 26, 30), appear to be editing errors.

24       [5]   Consistently, the letters "RTS" on the VIND form, dated June 7, 2006, and apparently
     written by defendant Brandon, are on the line designated for plaintiff's signature to
25   "acknowledge receipt of all aforementioned source documents and notification of interview."
     (Dkt. No. 137-3 at 4 (Pltfs. Exh. B).)  The line designating "Staff Assistance:  Waived [or]
26   Requested by Inmate," is blank.

1    until August 31, 2006, when Defendant Brandon interviewed me at the Second Level Review,"

2    pursuant to plaintiff's administrative  grievance challenging his validation.  (Id.)  Plaintiff asserts

3    that the responsive statement attributed to him by Parker on June 8, 2006 ("I am a Mexican

4    National and not a gang member.  I feel I have been set up."), was the statement that plaintiff

5    made to Parker when he Parker escorted plaintiff to the program office on June 7, 2006.  (Id. ¶¶

6    12, 17.)

7            Of plaintiff's several procedural challenges, only the alleged denial of a timely

8    interview and opportunity to be heard asserts a federal constitutional claim, and whether such

9    interview took place on June 8, 2006, presents a material factual dispute.  Consistent with his

10   allegations before this court, plaintiff stated, in his administrative grievance filed June 18, 2006,

11   challenging his validation (Log No. SAC-S-06-1422), that Brandon had disclosed the relevant

12   chronos on June 7, 2006; however, plaintiff did not reference an interview or hearing, or the date

13   June 8, 2006.  (ECF No. 87-2 at 116.)  Neither of the written decisions denying that grievance (at

14   the Second and Third Levels) note a June 8, 2006 interview or hearing.  (See ECF No. 137-3 at

15   11, 20 (noting only the June 7, 2006 disclosure of source items by defendant Brandon).)

16   Moreover, despite defendant Parker's signature on documents indicating that he interviewed

17   plaintiff on June 8, 2006 (see ECF No. 134-9 (Dfts. Exh. E1 (CDC 128-B form); Dkt. No. 137-3

18   at 4 (Pltfs. Exh. B) (the VIND form)), Parker does not make this assertion in his affidavit or any

19   reference to June 8, 2006 (see Parker Decl.).  Finally, as earlier noted, defendant Brandon did not

20   file an affidavit in support of defendants' motion and conceded, in discovery, that he was not

21   aware of the all relevant due process procedures under the California Code of Regulations and

22   DOM.

23          For these reasons, the court is unable to resolve the material factual dispute

24   whether plaintiff was accorded a hearing and opportunity to present his views to the critical

25   decision makers concerning his validation and related security placements.  Because a hearing

26   was required as a matter of federal due process, defendants' motion for summary judgment on

1   this claim should be denied, as to defendants Brandon and Parker.

2           2.  The Evidence[6]

3           Plaintiff challenges the reliability of the source items that were relied upon to

4   validate him as an EME associate.  Authorized source items include, inter alia, statements from

5   other inmates, debriefing reports, written materials and communications, and observation by

6   staff.[7]  Id., § 3378(c)(8).  Defendants validated plaintiff as an EME associate based on the

7   following five source items, each based on information provided by a confidential or unidentified

8   informant:  (1) a March 25, 2003 debriefing report authored by Sergeant Bales; (2) a February 4,

9   2004 confidential memorandum authored by Officer Wheeler; (3) an October 21, 2005

10  confidential memorandum authored by Officer Zamudio; (4) a January 26, 2006 debriefing report

11  authored by Sergeant Bales; and (5) a June 1, 2006 confidential memorandum authored by

12  defendant Parker.

13          A validation decision meets federal due process requirements if it is supported by

14  "some evidence."  Bruce v. Ylst, supra, 351 F.3d at 1287 (citing Superintendent v. Hill, 472 U.S.

15  445, 454 (1985)).  A single piece of evidence may be sufficient to meet the "some evidence"

16  requirement, if it has a "sufficient indicia of reliability."  Bruce, 351 F.3d at 1288 (citing

17  Toussaint IV, 926 F.2d at 803.  As recently clarified by the Ninth Circuit:

18           "Some evidence" review requires us to ask only "whether there is
             *any evidence* in the record that could support the conclusion."
19           Bruce, 351 F.3d at 1287 (emphasis added).  This test is "minimally
             stringent."  Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994).
20           Accordingly, "we do not examine the entire record, independently
             assess witness credibility, or reweigh the evidence."  Bruce, 351
21           F.3d at 1287.  Evidence only must bear "some indicia of
             reliability" to be considered "some evidence."   Toussaint v.
22

23          [6]  The Ninth Circuit has emphasized that "procedural, not substantive, due process
        guarantees inmates that their validation will be based on some evidence."  Castro v. Terhune,
24      712 F.3d at 1314.

25          [7]  Source items may also include self admissions, tattoos and symbols, photographs,
        information from staff and other agencies, associations, offenses, legal documents and visitors.
26      15 Cal. Code Regs. § 3378(c)(8.)

McCarthy, 926 F.2d 800, 803 (9th Cir. 1990).  Moreover, evidence may qualify as "some evidence," even if it does not "logically preclude[ ] any conclusion but the one reached."  Hill, 472 U.S. at 457, 105 S.Ct. 2768.

Castro v. Terhune, 712 F.3d at 1314.

Plaintiff challenges the reliability of the subject source items based on the factors identified in Zimmerlee v. Keeney, 831 F.2d 183, 186-67 (9th Cir. 1987).  Defendants respond that "the test announced in Zimmerlee is inapplicable" to gang validations.  (ECF No. 139 at 7.)  However, it appears that both the Ninth Circuit Court of Appeals and district courts in this circuit have applied the Zimmerlee reliability factors to gang validation source items that rely on information provided by confidential informants.  See, e.g., Gamez v. Gonzales, 481 Fed. Appx. 310, 311 (9th Cir. 2012); see also Perez v. McDonald, 2012 WL 4510955, *6-7 (E.D. Cal. 2012); Ruiz v. Fischer, 2010 WL 4807052, *6  (N.D. Cal. 2010); Lira v. Director of Corrections, 2008 WL 619017, *10 (N.D. Cal. 2008); Lopez v. Valdez, 2007 WL 1378017, *4-5 (N.D. Cal. 2007); Rojas v. Cambra, 1997 WL 294409, *4 (N.D. Cal. 1997); Stewart v. Alameida, supra, 418 F. Supp. 2d at 1168; Stearns v. Flores, 2005 WL 1836915, *10 (E.D. Cal. 2005); Harrison v. McGrath, 2004 WL 1465698, *4-5  (N.D. Cal. 2004); Madrid v. Gomez, 889 F. Supp. 1146, 1274 (N.D. Cal.1995).

In Zimmerlee, a habeas corpus action, the Ninth Circuit Court of Appeals upheld a prison disciplinary decision that rested on the eyewitness account of an unidentified informant, whose account was deemed reliable because the informant had previously supplied reliable information and passed a polygraph examination concerning his relevant statements.  The Ninth Circuit held that "a prison disciplinary committee's determination derived from a statement of an unidentified inmate informant satisfies due process when (1) the record contains some factual information from which the committee can reasonably conclude that the information was reliable, and (2) the record contains a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name."  Zimmerlee, 831 F.2d at 186.

1    The parties do not dispute that each chrono contains Parker's statement that the disclosure of the

2    underlying confidential information/source item would "threaten the safety and security of the

3    institution."  Their dispute concerns the reliability of the confidential information.

4            The court identified the following methods, or factors, for establishing the

5    reliability of a confidential informant's statement:

6            Reliability may be established by:  (1) the oath of the investigating
         officer appearing before the committee as to the truth of his report
7        that contains confidential information, (2) corroborating testimony,
         (3) a statement on the record by the chairman of the committee that
8        he had firsthand knowledge of sources of information and
         considered them reliable based on the informant's past record, or
9        (4) an in camera review of the documentation from which
         credibility was assessed.  Proof that an informant previously
10       supplied reliable information is sufficient.

11   Zimmerlee, 831 F.2d at 186-87 (fn. omitted) (citations omitted)

12           Defendants maintain that the underlying information is reliable because each

13   "source incriminated himself/herself in a criminal activity at the time of providing the

14   information." 15 Cal. Code Regs. § 3321(c)(3).[8]  (ECF No. 134-2 at 14; ECF No. 139 at 6-7; see

15   also CDC 1030 chronos, dated June 7, 2006 (Dfts. Exh. E2-E4).)[9]  However, Zimmerlee appears

16   to require more than an official's unsworn statement that the information provided by a

17   ////

18

19           [8]  Under California law, "[a] confidential source's reliability may be established by one
     or more of the following criteria:  (1) The confidential source has previously provided
20   information which proved to be true. (2) Other confidential sources have independently provided
     the same information. (3) The information provided by the confidential source is
21   self-incriminating. (4) Part of the information provided is corroborated through investigation or
     by information provided by non-confidential sources. (5) The confidential source is the victim."
22   Id., § 3321(c); see also §§ 3321(b)(1); 3378(c)(8)(H).

23           [9]  In further support of the alleged reliability of each source, defendant Parker states
     generally that he "ensured" that all source items "met the reliability standards" established by
24   California regulations (Parker Decl. ¶ 8), and defendants note in their briefing that plaintiff's
     gang validation was approved in September 2006 by the three-member panel of the Office of
25   Correctional Safety.  (Dfts. Exh. E14).)  However, pursuant to discovery, defendant Brandon
     denied that information received from an informant during debriefing must meet the reliability
26   standards set forth in the DOM.  (Rios Decl. ¶ 21; Exh. G (ECF No. 137-2 at 35).)

confidential informant was self-incriminating.[10]  As plaintiff asserts, no defendant has presently

attested to the reliability of the underlying confidential information.  The record contains no

evidence of the oath or affidavit of an investigating officer, or any statement of firsthand

knowledge by any official.

        The only attenuated basis for meeting any of the <u>Zimmerlee</u> reliability factors are

the following references to -- but not evidence of -- some corroborating evidence.  <u>Accord</u>, 15

Cal. Code Regs. § 3321(c)(4) (reliability of information provided by confidential source may be

established if "[p]art of the information provided is corroborated through investigation or by

information provided by non-confidential sources").  The court's independent review of the

record demonstrates that CSP-SAC Warden Malfi found (in apparent reliance on the findings of

defendant Brandon), in reviewing plaintiff's administrative grievance challenging his gang

validation, that three of the source items were reliable because supported by corroborating

evidence.  These items were the debriefing reports authored by Sergeant Bales, and the

confidential memorandum prepared by defendant Parker.[11]  The record contains no similar

indicia of corroborating evidence in support of the 2005 memorandum authored by Officer

Zamudio, or the 2004 confidential memorandum authored by Officer Wheeler.  (<u>See</u> ECF No.

137-3 at 11.)

---

[10]  In fact, defendants offered no evidence indicating whether the confidential informants were prosecuted or otherwise disciplined for their self-incriminating statements, or whether a deal was reached in return for their providing such statements, and without such threat of punishment the information may not be reliable.

[11]  In denying, at the Second Level, plaintiff's grievance challenging his gang validation (Log No. SAC-S-06-1422), Warden Malfi found that the information contained in Sergeant Bales' 2003 report (which stated that an unidentified inmate had reported that plaintiff sold drugs for inmate "Chispas," a validated EME associate) was "corroborated by other sources," and "part of the information" was "corroborated through investigation."  (ECF No. 137-3 at 12.)  Similarly, Warden Malfi found that "part of the information" contained in Sergeant Bales' 2006 report (which stated that an unidentified inmate had reported that plaintiff was a "mesa member" of the EME prison gang working under the direction of "Chispas") was "corroborated through an investigation."  (<u>Id.</u> at 11.)  The third item was defendant Parker's 2006 confidential memorandum (which stated that plaintiff's name was on a list of active EME associates), which Warden Malfi found was "corroborated by other sources" and "through investigation." (<u>Id.</u>)

1        However, the court is reticent to conclude, on this basis alone, that one or more of

2  the three identified source items is reliable and thereby meets the "some evidence" standard

3  constitutionally required to support plaintiff's gang validation.  Castro v. Terhune, 712 F.3d at

4  1314; Toussaint IV, 926 F.2d at 803.  Defendants do not rely on Warden Malfi's assessments,

5  and there is no other record evidence demonstrating that the identified source items are supported

6  by corroborating evidence.

7        Moreover, no underlying debriefing reports or confidential memoranda have been

8  provided to the court for in camera review.[12]  In similar cases, defendants have submitted the

9  disputed confidential information for in camera review.  In Castaneda v. Marshall, 1997 WL

10  123253 (N.D. Cal. 1997), aff'd, 142 F.3d 442 (9th Cir. 1998), in response to plaintiff's

11  constitutional challenge to the evidence supporting his validation as an EME member, defendants

12  submitted to the court "38 separately corroborated confidential memoranda from different

13  institutions and individuals for in camera review[.]"  Id. at *5.  Pursuant to the standards

14  articulated in Zimmerlee, the court found:  "Based on its in camera review, the Court is satisfied

15  that there is sufficient corroborated and reliable information linking Plaintiff to the EME to

16  support the prison officials' conclusion that Plaintiff is a member of the EME."  Id. at 6.

17  Similarly, in Juarez v. Alameda, 2008 WL 3155162, *7-8 (E.D. Cal. 2008), the court noted that it

18  had before it "for in camera review Plaintiff's validation package," including "the confidential

19  memoranda in their entirety," and found "the information documented to be detailed and have the

20  appearance of sufficient reliability."  In Medina v. Gomez, 1997 WL 488588, *4 (N.D. Cal.

21  1997), an action challenging plaintiff's gang validation, the court concluded, "[b]ased on its in

22  camera review . . . that well over three of the thirty-three documents satisfy the Zimmerlee

23  standard of reliability, either because the information was supported by corroborating testimony

24

25        [12]  This notation is not to say that the disputed confidential information had to be
submitted to the court because if such information was independently corroborated such

26  submission would not be necessary.

1   or because the informant was found to have supplied other, reliable information."  In <u>Reyes v.</u>

2   <u>Horel</u>, 2010 WL 1222286,*7-8 (N.D. Cal. 2010), the court denied defendants' motion for

3   summary judgment on plaintiff's due process claims, finding, in pertinent part, a material factual

4   dispute concerning the reliability of a letter and related confidential memorandum that were

5   relied upon to maintain plaintiff's gang status.  The court noted that, "[u]nfortunately, defendants

6   have not submitted the letter or the confidential memorandum as evidence or for in camera

7   review.  <u>Id.</u> at *8.  <u>Accord</u>, <u>Pappan v. Marshall</u>, 1995 WL 251150, 2 (N.D. Cal.1995), vacated

8   on other grounds, 103 F.3d 140 (9th Cir. 1996) (pursuant to <u>Zimmerlee</u>, the court found, "[b]ased

9   on its in camera review . . .that there is sufficient corroborated information linking plaintiff to the

10  AB [gang] and other illegal activity so as to satisfy due process requirements"); <u>Martinez v.</u>

11  <u>Cathey</u>, 2006 WL 224400 (E.D. Cal. 2006), and cases cited therein (pursuant to <u>Zimmerlee</u> et al.,

12  the district judge directed the magistrate judge to review in camera confidential materials

13  submitted by defendants in support of plaintiff's gang validation); <u>see</u> <u>also</u> <u>Cato v. Cambra</u>, 1996

14  WL 478638, *3 (N.D. Cal. 1996) (in upholding prison disciplinary action, the court stated that it

15  "has reviewed the documents in camera and finds that the disciplinary board could have

16  reasonably concluded that the information was reliable").

17          These authorities, applied to the present record, persuade the undersigned that,

18  under <u>Zimmerlee</u>, defendants have failed to demonstrate the reliability of the confidential

19  information underlying any of the five source items used to validate plaintiff.[13]  While this court

20  is cognizant of the "minimally stringent" test applicable to a "some evidence" analysis, <u>Castro</u>,

21

22          [13]  For this reason, the court does not reach plaintiff's further reliability challenges to the
    subject source items, specifically:  (1) that Sergeant Bales' reliance on the term "mesa member"
23  falls short of demonstrating that plaintiff engaged in "specific gang related acts or conduct," as
    required under 15 Cal. Code Regs. § 3378(c)(8)(M); (2) that Officer Wheeler's confidential
24  memorandum should have been disclosed to plaintiff because allegedly written by plaintiff,
    citing 15 Cal. Code Regs. § 3378(c)(6)(C) (prisoner "shall be given copies of all non-confidential
25  documents"); and (3) that defendant Parker's confidential memorandum improperly relies on a
    "laundry list" of alleged gang affiliates, which is impermissible for the reasons stated in <u>Lira v.</u>
26  <u>Cate</u>, <u>supra</u>, Case No. C 00-0905 SI (N.D. Cal. 2009) (ECF No. 456 at 46).

1   712 F.3d at 1314, the analysis in the instant case must also take into consideration the material

2   factual dispute whether plaintiff was accorded a hearing and opportunity to express his view.

3        For these reasons, the undersigned recommends that defendants' motion for

4   summary judgment be denied on plaintiff's "some evidence" challenge, which should proceed to

5   trial against defendants Brandon and Parker.

6        B.  <u>Due Process Claims Against Defendants Tilton and Lockwood</u>

7        For the following reasons, the court finds that plaintiff has failed to substantiate

8   his due process claims against defendants Lockwood and Tilton.

9        1.  <u>Defendant Lockwood</u>

10       Plaintiff's due process claim against defendant Lockwood, CDCR's Chief of

11  Regulations and Policy Management Branch Standards, is premised on defendant's alleged

12  support of, and refusal to modify, housing and gang validation regulations and policies that

13  allegedly promote associations among inmates of the same ethnicity, many of whom are gang

14  affiliates, then unfairly rely on these associations to demonstrate an inmate's gang affiliation.

15  Plaintiff sought the modification of these alleged "underground regulations" by submitting to

16  defendant Lockwood, on January 14, 2007, a Petition to Promulgate Regulations.  (Rios Decl. ¶

17  20; <u>see also</u> Exh. E (ECF No. 137-3 at 30).  On January 27, 2007, Lockwood sent plaintiff a

18  Notice of Decision, also published in the California Regulatory Notice Register, denying the

19  petition.  (<u>Id.</u> at 29-31.)  Plaintiff's due process claim against Lockwood is premised on the

20  official's alleged failure to make regulatory and policy changes consistent with plaintiff's

21  proposals.

22       In his opposition to defendants' motion for summary judgment, plaintiff asserts

23  that defendant Lockwood "knew of the housing policy and its correlation to gang validation

24  proceedings, and Mr. Rios made him aware of the effect of this policy by sending Defendant

25  Lockwood a petition on January 14, 2007.  Specifically, Mr. Rios informed Defendant Lockwood

26  that inmates who live with Mexican Nationals are often surrounded by gang members and

therefore forced to "associate" with them, but yet, when subject to gang validation proceedings, have no meaningful opportunity to be heard or to rebut the evidence.  (See Rios Decl., ¶ 20; Exhibit E.)  Defendant Lockwood failed to substantively address Mr. Rios's concerns.  As such, he knew that Mr. Rios's validation resulted from the unlawful housing and gang validation policies and failed to act."  (Oppo. (ECF No. 137 at 19.)

However, plaintiff has not, in this action, demonstrated the existence of a material factual dispute whether existing validation and housing regulations and policies were or are racially discriminatory, either facially or as applied, and hence cannot premise his due process claims against defendant Lockwood on the content of the challenged regulations and policies, or defendant's failure to modify them.  Moreover, plaintiff's allegation that Lockwood intentionally refused to rectify plaintiff's allegedly improper validation and placements, by failing to pursue the adoption and implementation of plaintiff's proposed regulatory and policy changes, fails to allege the requisite personal involvement to sustain a supervisory claim under Section 1983.  See Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (plaintiff must demonstrate that supervisory defendant personally participated in the alleged deprivation of constitutional rights).

Therefore, the court finds that plaintiff has failed to sustain a due process claim against defendant Lockwood, for whom summary judgment should be granted.

2. Defendant Tilton

The complaint's only relevant allegations against defendant Tilton, former CDCR Secretary, are set forth in plaintiff's requests for injunctive relief, wherein he seeks, in pertinent part, the following injunctive relief:  that "Defendant Secretary [Tilton] . . . [1] cease the practices of validating the inmates as a prison gang as threat to the safety of the security of the institution and others, merely by using hearsays and perjury testimonies from criminal inmates" (Cmplt. (ECF No. 1) at 19); (2) "cease the scheme of using unreliable, untrue, insufficient information in imposing gang validation and indeterminate (SHU) terms [generated as a result of] . . . classifying all the inmates according to their ethnic group and mixed with gang members,

1  associate/affiliated" (id. at 21); (3) "implement a clear and fair prison gang management policy"[14]

2  (id. at 22); (4) "cease the practice of discriminatory classification and segregation of

3  Hispanic/Mexican prisoners and foreign Mexican National inmates not a gang related or

4  associated" (sic) (id.); and (5) "cease the practice of using any underground regulation which has

5  not been properly promulgated pursuant to the (APA) [Administrative Procedures Act]

6  Government Code section 11342 et seq." (id. at 23).

7         In his opposition to defendants' motion for summary judgment, plaintiff asserts in

8  relevant part that defendant Tilton's responsibilities as CDCR Secretary "strongly suggest that

9  [he was] aware of the prison housing policy that segregates inmates by ethnicity," which plaintiff

10  contends defendants improperly relied upon as alleged proof of his gang associations.  (Oppo.

11  (ECF No. 137 at 18).)  Plaintiff further asserts that "there is a strong inference that [Tilton is]

12  aware of the gang validation procedures that validate inmates as gang members by association

13  with other gang members."  (Id.)  In an attempt to demonstrate the direct involvement required

14  for supervisory liability, plaintiff contends (id. at 18-9):

15           Since Defendant Tilton is responsible for the effective management
             of care and treatment of the inmates, he would have been
16           instrumental in enforcing the housing policy or reviewing it
             for its effectiveness.  Since he is the chairman of the Board of
17           Parole Hearings, he would have also known of the gang validation
             proceedings that led to Mr. Rios's gang validation.  As such,
18           the record suggests that Defendant Tilton knew of the housing and
             gang validation policies and took no action to investigate them for
19           the effective management of treatment of the inmates, or
             that he promulgated the unlawful policies.  Either way, he was
20           directly involved with the policies that resulted in the deprivation
             of Mr. Rios's due process rights.

21

22
       _____

23     [14]  Specifically, plaintiff seeks "a clear and fair prison gang management policy that:  (1)
       provides inmates adequate notice of what conduct is proscribed and what conduct is permitted;
24     (2) defines key terms, i.e. gang activity, threat, inactive and active gang affiliates, associates,
       involvement in gang activity, association; (3) provides clarity for enforcement and does not reach
25     a broad range [of] innocent conduct or provide unbridled discretion to defendants; (4) provide
       reasonable minimal standards to guide defendants when they [are] judging whether or not any
26     inmate is a prison gang affiliate/associate or threat to the safety or the security of the institution
       and others."  (Cmplt. at 22.)

1    　　　　The court finds plaintiff's allegations against defendant Tilton to be tangential and

2    theoretical, as well as impermissibly vague and conclusory.  Ivey v. Board of Regents, 673 F.2d

3    266, 268 (9th Cir. 1982).  There can be no liability under Section 1983 unless there is some

4    affirmative link or connection between a defendant's  challenged conduct and the claimed

5    constitutional deprivation.  Rizzo v. Goode, 423 U.S. 362, 371 (1976); May v. Enomoto, 633

6    F.2d 164, 167 (9th Cir. 1980); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  To sustain a

7    claim for relief under Section 1983, based on a theory of supervisory liability, a plaintiff must

8    allege some facts demonstrating that the supervisory defendant personally participated in the

9    alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent

10   them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation

11   of constitutional rights' and is 'the moving force of the constitutional violation.'"  Hansen, supra,

12   885 F.2d at 646 (internal citations omitted).  Plaintiff has failed to allege any facts from which to

13   reasonably infer that defendant Tilton had any direct role in, or connection to, any act resulting in

14   the alleged deprivation of plaintiff's constitutional rights.  Plaintiff does not direct the court to

15   any evidence demonstrating that the challenged housing or gang validation policies were "the

16   moving force" behind plaintiff's cognizable constitutional claims.

17   　　　　Accordingly, the court finds that summary judgment should be granted for

18   defendant Tilton on plaintiff's due process claims.

19   　　C. Retaliation

20   　　　　Plaintiff contends that his gang validation and SHU placement were actively

21   sought by defendants Mayfield and Parker, who acted in retaliation against plaintiff for

22   exercising his First Amendment right to file administrative grievances.

23   　　　　1. Legal Standards

24   　　　　"A prisoner suing prison officials under section 1983 for retaliation must allege

25   that he was retaliated against for exercising his constitutional rights and that the retaliatory action

26   does not advance legitimate penological goals, such as preserving institutional order and

1  discipline." Barnett v. Centoni, 31 F.3d 813, 816 (citing Rizzo v. Dawson, 778 F.2d 527, 532

2  (9th Cir. 1985)).  "[A] viable claim of First Amendment retaliation entails five basic elements:

3  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3)

4  that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

5  First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional

6  goal." Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).  Direct and tangible harm will

7  support a First Amendment retaliation claim even without demonstration of chilling effect on the

8  further exercise of a prisoner's First Amendment rights.  Id. at 568, n.11.  "[A] plaintiff who fails

9  to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a

10 retaliatory adverse action.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), citing Rhodes,

11 408 F.3d at 568 n.11.

12       A plaintiff must plead facts which suggest that retaliation for the exercise of

13 protected conduct was the "substantial" or "motivating" factor behind the defendant's conduct.

14 Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).  Mere conclusions of

15 hypothetical retaliation will not suffice; rather, a prisoner must "allege specific facts showing

16 retaliation because of the exercise of the prisoner's constitutional rights."  Frazier v. Dubois, 922

17 F.2d 560, 562 n.1 (10th Cir. 1990).  Retaliatory motive may be shown by the timing of the

18 allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence.

19 Bruce v. Ylst, supra, 351 F.3d at 1288-89 (retaliatory validation as a gang member for filing

20 grievances); Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) .

21       However, "[a] retaliation claim is not plausible if there are 'more likely

22 explanations' for the action . . . . 'When the causation element of Rhodes is combined with the

23 pleading requirements of Iqbal [Ashcroft v. Iqbal, 556 U.S. 662 (2009)], it is apparent that to

24 state a retaliation claim a prisoner must plead sufficient facts to make plausible a claim that the

25 defendants' actions were motivated by a desire to retaliate for his exercise of a constitutional

26 right, rather than by some other motive.'  Yelenich v. Cate, 2011 WL 1100124, *2 (N.D. Cal.,

1    Mar.23, 2011)."  Morgan v. Halbesein, 2012 WL 5830003, *5 (C.D. Cal. 2012).

2            Once such a prima facie showing of retaliation is made, the burden shifts to the

3    defendant prison officials to show, by a preponderance of the evidence, that the alleged

4    retaliatory action was conduct narrowly tailored to serve a legitimate penological purpose.

5    Schroeder v. McDonald, 55 F.3d 454, 461-62 (9th Cir. 1995).  However, "prison officials may

6    not defeat a retaliation claim on summary judgment simply by articulating a general justification

7    for a neutral process, when there is a genuine issue of material fact as to whether the action was

8    taken in retaliation for the exercise of a constitutional right."  Bruce, 351 F.3d at 1289 (citations

9    omitted).

10           2. Defendant Mayfield

11           Plaintiff's retaliation claim against defendant Mayfield survived defendants' last

12   summary judgment motion.  Thus, the parties were directed to refrain, pursuant to the instant

13   motion, from addressing "any contention challenging plaintiff's claim against defendant

14   Mayfield."  (ECF No. 133 at 2.)  The court denied defendants' prior motion for summary

15   judgment on plaintiff's retaliation claim against defendant Mayfield, for the following reasons

16   (ECF No. 96 at 27-8):

17            Plaintiff contends that defendant Mayfield, plaintiff's female
              correctional counselor, referred plaintiff for gang validation in
18            retaliation for plaintiff filing an administrative grievance (Log No.
              SAC-C-06-0599) that challenged Mayfield's decisions.  Plaintiff
19            testified at his deposition that he filed the administrative grievance,
              challenging two classification decisions in which Mayfield
20            participated, in order "to lower my classification custodian number
              so that I could be able to participate in programs and to work."
21            (Dkt. No. 83-4 at 8.)  Plaintiff testified that Mayfield "failed in not
              removing the false gang member activity that's in my file . . . .
22            [S]he could have and she had the right to remove all that and
              correct it."  (Id. at 4.)  Plaintiff stated that he believed Mayfield
23            thereafter acted in retaliation "due to the 602."  (Id. at 5.)

24            Although no evidence of record appears to directly support
              plaintiff's contention, the timing of the relevant matters supports a
25            reasonable inference that Mayfield may have referred plaintiff for
              the gang validation investigation, and may have done so in
26            retaliation for plaintiff's filing and continued pursuit of the subject

                                      33

administrative grievance:  the challenged classification decision was made on December 6, 2005; plaintiff filed his grievance on December 12, 2005; defendant Mayfield interviewed plaintiff regarding the grievance on April 5, 2006; plaintiff directly challenged Mayfield's interview findings on April 16, 2006; and, on June 7, 2008, plaintiff was informed of his gang validation investigation.

Significantly, defendant Mayfield has not filed a declaration in this action,[15] and therefore has not rebutted these reasonable inferences.  Thus, the court finds that plaintiff has demonstrated the existence of material factual disputes concerning Mayfield's role in plaintiff's gang validation investigation and, assuming some role, Mayfield's motivation.

The additional elements for stating a retaliation claim have been sufficiently alleged.  Plaintiff's alleged injuries as a result of his gang validation satisfy the requirement of a "direct and tangible harm" resulting from an alleged adverse action.  Brodheim, 584 F.3d at 1269; Rhodes, 408 F.3d at 568 n.11.  Moreover, the [prior] finding that plaintiff's validation was consistent with due process requirements does not resolve plaintiff's retaliation claim.  "[I]f, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish [plaintiff] because he filed grievances, they cannot assert that [plaintiff's] validation served a valid penological purpose, even though he may have arguably ended up where he belonged."  Bruce, supra, 351 F.3d at 1289, citing Rizzo, supra, 778 F.2d at 532.

Therefore, the court finds that plaintiff has alleged against defendant Mayfield a viable claim of First Amendment retaliation, for which he has demonstrated the existence of material factual disputes requiring resolution by trial.

For these reasons, plaintiff's retaliation claim against defendant Mayfield will continue to proceed to trial.

### 3. Defendant Parker

Plaintiff contends that defendant Parker also "used the gang validation procedure as a 'cover or ruse' to retaliate against him" for plaintiff's exercise of his First Amendment right

////

---

[15]  Although defendant Mayfield has since submitted a declaration, dated December 11, 2012 (see Dfts. Exh. G), it does not address the substance of plaintiff's retaliation claim, only defendant Mayfield's alleged lack of authority to implement injunctive relief.

34

to file administrative grievances.[16]  (Pltf. Oppo. (ECF No. 137 at 11-12).)  Plaintiff asserts that

defendant Parker's two alleged statements to plaintiff -- viz., that in September 2004, Parker told

plaintiff "that the prison administration was 'tired of me filing many 602 appeals' and that if I did

not stop, he would have no choice but to validate me as a prison gang associate so that he could

put me in the SHU" (Rios Decl. ¶ 6); and, on June 7, 2006, that Parker told plaintiff, in the

context of the currently challenged gang validation, that "the administration and warden were

'tired of my 602 complaints'" (Rios Decl. ¶ 12) -- allegedly demonstrate that Parker was

motivated by retaliation when he pursued plaintiff's gang validation.

In response, defendants assert that Parker's motivation for investigating and

recommending plaintiff's gang validation is "undisputed," because his actions furthered

legitimate penological purposes.[17]  (See Dfts. Mtn. (ECF No. 134-2 at 20).  Defendants rely on

---

[16]  Plaintiff does not repeat his second argument in support of a retaliation claim against
Parker, which this court previously rejected for the following reasons (ECF No. 96 at 26 (internal
citations omitted)):

> The record lacks evidentiary support for the claim that Parker's response to
> plaintiff's administrative grievance was an "adverse action."  Parker has filed a
> declaration in which he states that, after he partially granted plaintiff's grievance
> at the informal level (finding, in pertinent part, that there was insufficient
> information to validate plaintiff), he did not further participate in the grievance.
> This statement is supported by review of the grievance through its exhaustion.
> The official responses to this grievance following the response of Parker (Roth at
> the First Level Review on February 3, 2005, Warden Kernan at the Second Level
> Review on March 7, 2005, and the Inmate Appeals Branch Chief, N. Grannis, at
> the Third Level Review on June 24, 2005), support Parker's sworn statement that
> he "had no involvement in appeal SAC-C-04-02235 after responding to it at the
> informal level."  Parker further declares that he "had no communication with
> Sergeant Roth, or any other correctional staff member regarding appeal
> SAC-C-04-02235 after [Parker] responded to this grievance at the informal level."
> Plaintiff has presented no evidence to rebut Parker's supported statements.
> Moreover, although the subject grievance was ultimately denied, plaintiff obtained
> the relief he sought, i.e., elimination of the "Border Brother" classification,
> replaced by reference to "Mexican National."

[17]  Defendants also assert that plaintiff, at his deposition, failed to repeat his allegations
against Parker.  (See Dfts. Reply (ECF No. 139 at 3.)  The court's review of defendants' citations
to the transcript of plaintiff's deposition demonstrates that defendants did not accord plaintiff an
adequate opportunity to address this matter.  (Id.)  Therefore, the court finds inapposite
defendants' reliance on case law holding that a party cannot create an issue of fact by an affidavit

1    Parker's statements, in part, that "[i]n recommending an inmate for gang validation, I have never

2    been motivated by any grievances filed by the inmate," and that his "sole" motivation in

3    recommending plaintiff's validation was to ensure institutional safety and security.  (See Parker

4    Decl. ¶¶ 11-3.)

5            The court notes, initially, that plaintiff has submitted less evidence in support of

6    his retaliation claim against defendant Parker, than he did in support of his retaliation claim

7    against defendant Mayfield.  Plaintiff contends that Mayfield, his correctional counselor,

8    retaliated against plaintiff after he filed an administrative grievance challenging two of

9    Mayfield's classification decisions that rendered plaintiff ineligible to participate in programs

10   that would support an earlier parole.  The alleged conflict between plaintiff and Mayfield was

11   direct and tangible, and the administrative grievance that allegedly triggered Mayfield's

12   retaliatory referral of plaintiff for a gang validation investigation, was a direct challenge to

13   Mayfield's authority.  Thus, plaintiff's allegations against defendant Mayfield, viewed in the

14   light most favorable to plaintiff, support a reasonable inference that Mayfield, motivated by

15   retaliation against plaintiff for filing an administrative grievance that challenged her authority,

16   referred plaintiff for the subject gang investigation.

17           Nevertheless, while plaintiff alleges no facts to suggest that defendant Parker had

18   a personal motive for retaliating against plaintiff, the material factual disputes whether Parker

19   held a hearing on June 8, 2006, and concerning the reliability of the validation source items, casts

20   possible doubt on Parker's credibility, and supports a reasonable inference that Parker may have

21   pursued plaintiff's validation to further Mayfield's alleged retaliatory motive.

22           The timing of Parker's confidential memorandum and related chronos in support

23   of plaintiff's validation, submitted within six weeks after plaintiff's challenge to Mayfield's

24   interview findings, supports this reasonable inference, particularly because it appears that Parker

25   _____

26   contradicting his prior deposition testimony.  (Id. (citing Kennedy v. Allied Mut. Ins. Co., 952
     F.2d 262, 266 (9th Cir. 1991)).)

1    could have previously initiated the investigation.  When Parker initially investigated plaintiff's

2    alleged gang affiliations, in December 2004, two source items existed, the March 2003

3    debriefing report authored by Sergeant Bales, and the February 2004 confidential memorandum

4    authored by Officer Wheeler.  When Officer Zamudio submitted his confidential memorandum

5    in October 2005, a total of three sources items had been submitted, the requisite number to

6    commence the validation process.  See 15 Cal. Code Regs. § 2278(c).  Sergeant Bales submitted

7    the fourth source item in January 2006.  However, it was not until June 2006, after Mayfield's

8    challenged interactions with plaintiff, that Parker commenced the validation process against

9    plaintiff.  Parker's apparently delayed commencement of plaintiff's validation suggests that

10   Parker may have acted upon Mayfield's request.  Moreover, defendants' contention that Parker's

11   pursuit of plaintiff's validation furthered a legitimate penological purpose, without more, falls

12   flat.  As the court previously emphasized, "[i]f . . . defendants abused the gang validation

13   procedure as a cover or a ruse to silence and punish [plaintiff] because he filed grievances, they

14   cannot assert that [plaintiff's] validation served a valid penological purpose . . . ." Bruce, supra,

15   351 F.3d at 1289, citing Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985).

16          Therefore, the court finds that plaintiff has pled facts that support a reasonable

17   inference that retaliation for plaintiff's filing of administrative grievances was a "substantial" or

18   "motivating" factor behind defendant Parker's commencement of plaintiff's validation

19   investigation.  Accordingly, the undersigned recommends that defendants' motion for summary

20   judgment be denied on plaintiff's retaliation claim against defendant Parker.

21          D.  Qualified Immunity

22          All defendants contend they are entitled to qualified immunity for their challenged

23   conduct.  The court need not reach this contention with respect to plaintiff's claims against

24   defendants Tilton and Lockwood.  Where, as here, the facts do not state a cognizable

25   constitutional claim against a defendant, the court need not reach that defendant's qualified

26   immunity defense.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

1          In contrast, a qualified immunity defense will be rejected if, construing the facts in

2   the light most favorable to plaintiff, the defendant appears to have violated a constitutional right

3   that was clearly established at the time of the alleged injury.  Id.  Qualified immunity does not

4   apply where the facts, construed in the light most favorable to the party asserting the injury, show

5   a violation of a clearly established constitutional right of which a reasonable official should be

6   aware.  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  In the present case, it is undisputed

7   that, during the relevant period, plaintiff had a First Amendment right to file administrative

8   grievances without official retaliation, and a Fourteenth Amendment guarantee that his gang

9   validation and related security placements would be decided in compliance with due process

10  standards.  Defendants do not challenge these clearly established legal rights, but have asserted

11  only that their conduct conformed to these standards.

12          Accordingly, the court finds that neither defendant Brandon nor defendant Parker

13  are entitled to qualified immunity on plaintiff's due process claims, and neither defendant

14  Mayfield nor defendant Parker are entitled to qualified immunity on plaintiff's retaliation claims.

15      E.  Injunctive Relief

16          Defendants contend, correctly, that plaintiff lacks standing to pursue most of his

17  requests for injunctive relief, which seek broad systemic relief.  (See Cmplt. (ECF No. 1) at 3,

18  18-22.)  Nevertheless, liberally construing plaintiff's pro se complaint, as this court must,

19  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (pro se complaints must be liberally construed), "it is

20  clear that Mr. Rios seeks relief from his current housing, monetary damages, declaratory relief,

21  and the expungement of his validation." (Oppos. (ECF No. 137 at 19-20).)  These requests for

22  relief, against defendants in their individual and official capacities, should survive summary

23  judgment.

24  ////

25  ////

26  ////

VII.  <u>Conclusion</u>

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.  Defendants' motion for summary judgment (ECF No. 134), should be granted in part and denied in part.

2.  Summary judgment should be granted for defendants Tilton and Lockwood, who should be dismissed from this action.

3.  Summary judgment should be denied for defendants Brandon, Parker, and Mayfield.

4.  This action should proceed on plaintiff's due process claims against defendants Brandon and Parker, and plaintiff's retaliation claims against defendants Parker and Mayfield.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within 14 days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 26, 2013

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/rios0790.msj.2d